**Johnathan SHANNON, Plaintiff,**

**v.**

**Gerald L. BEPKO, In His Official Capacity as Vice-President of Indiana University-Purdue University at Indianapolis (IUPUI), G. Chris Keeley, In Her Official Capacity as Director of the Personnel Department of Indiana University-Purdue University at Indianapolis (IUPUI), Theresa S. Martin, In Her Official Capacity as Labor Relations Representative of Indiana University-Purdue University at Indianapolis (IUPUI), Clyde V. McAdams, In His Official Capacity as Manager of Stock Division of IUPUI-IU Medical Center, Defendants.**

**No. IP 87-327-C.**

United States District Court, S.D. Indiana, Indianapolis Division.

March 14, 1988.

ENTRY

BARKER, District Judge.

This case requires the court to address a basic question of constitutional law, a question that has apparently remained unanswered (at least unanswered in any published opinion) in both the state and federal courts of Indiana. Specifically, this court is asked to determine whether Indiana University—and in turn Indiana University–Purdue University at Indianapolis—share in the sovereign immunity of the state of Indiana under the Eleventh Amendment. Furthermore, this case necessitates that the court examine the far more familiar, but no less important issue of the scope and requirements of due process.

## I. BACKGROUND

There is little, if any, dispute about the relevant facts in this case.[1] On April 24, 1974, Indiana University–Purdue University at Indianapolis (IUPUI) hired the plaintiff Johnathan Shannon for an indefinite term as an hourly employee. By June 9, 1986, Mr. Shannon was working as an evening shift supervisor in the Materials Management Department, Stock Division. On June 10, 1986, the defendant Clyde V. McAdams, Manager of I.U. Medical Center's stock division, handed Mr. Shannon a letter informing him that he was suspended from work subject to termination. Mr. McAdams also gave the plaintiff a copy of a signed memorandum that had been written by Mr. McAdams. In that memorandum Mr. McAdams included a narrative of the facts and circumstances regarding Mr. Shannon's employment that concluded with the following sentence: "I am therefore recommending that Jonathan Shannon be suspended for a period of five (5) days beginning June 10, 1986, for just cause." That same day Mr. McAdams and an individual not a party to this suit, Mr. John Bleu, met personally with Mr. Shannon, explained to him the reason for his suspension, and advised him that within five days

David J. Dreyer, Krieg DeVault Alexander & Capehart, Indianapolis, Ind., for plaintiff.

Albert J. Velasquez, Associate University Counsel, Bloomington, Ind., for defendants.

1. Indeed, the court's statement of background facts is merely a summary of the parties' very helpful Joint Statement of Material Facts.

he would be informed as to whether he would be permitted to return to work. The next day, after consulation between Mr. McAdams, Frank Davis, and the defendant Theresa Martin, a termination letter dated June 11, 1986, was sent to Mr. Shannon. The letter stated that Mr. Shannon was being terminated "in accordance with Personnel Policy Section 30–B, 'Immediate Suspension Pending Discharge for Just Cause'...." Parties' Joint Statement, Exhibit C. In its relevant portion Policy 30–B states:

> An employee may be suspended without advance notice and without pay subject to discharge without further notice at the end of five workdays of suspension for just cause.

Parties' Joint Statement, Exhibit A.

Mr. McAdams has testified under oath that the sole "just cause" for Mr. Shannon's termination was the "falsifying [of] a University document." Apparently, on June 7, 1986, Mr. Shannon wrote on his time sheet that he had worked from 3:00 p.m. until 11:00 p.m. when in fact he had only worked from 3:00 p.m. to 6:00 p.m. Mr. Shannon has testified that the discrepancy was simply an "honest mistake." He alleges that he wrote all of his hours down on his time sheet when he first arrived for work and that, when he was later unexpectedly required to leave early, he simply forgot to correct his time sheet to reflect the shortened hours he had actually worked. Plaintiff's Brief in Support of Motion for Summary Judgment [Plaintiff's Brief in Support] at 11. Mr. McAdams did not accept Mr. Shannon's allegation of an "honest mistake" and took the problem to the personnel department. According to Mr. McAdams, the personnel department stated that, as far as they were concerned, allegedly falsifying a University document was enough to justify an immediate discharge pursuant to Policy 30–B.

On April 2, 1987, Mr. Shannon filed suit in federal district court alleging that his termination "without any kind of pre-deprivation hearing, adequate appeal opportunity, or just cause" violated his Fourteenth Amendment right to due process. Complaint at 5. As relief, Mr. Shannon sought reinstatement, back pay, attorneys fees, and $1.5 million in damages for violation of his constitutional rights. The complaint named four defendants, each of whom is being sued solely in his or her official capacity as a university employee.[2] The parties have now filed cross-motions for summary judgment. The plaintiff argues that as a matter of law he had a protectible property interest in his continued employment with IUPUI and that, therefore, his dismissal without any form of predeprivation hearing was a clear violation of his procedural due process rights. Plaintiff's Brief in Support at 3–8. Furthermore, he urges that the undisputed facts show that the defendants violated his substantive due process rights by arbitrarily dismissing him in a manner that lacked both a rational basis and fundamental fairness. *Id.* at 9–12. The defendants counter the plaintiff's arguments by asserting that they are in fact entitled to summary judgment in their favor. They argue that Mr. Shannon's claim is not actionable because the Eleventh Amendment bars claims against the named defendants in their official capacities. If this court finds that the action is not barred, they assert that as a matter of law Mr. Shannon had no protectible property interest in his continued employment— and that, even if he did, he was given all the pretermination procedure he was due. Defendants' Memorandum in Support of Their Corss–Motion for Summary Judgment [Defendants' Memorandum in Support] at 1–2. The plaintiff in turn replies that Eleventh Amendment immunity does not apply to the defendants and that, even if it does, it would not bar his equitable claims for reinstatement, attorneys' fees, and back pay. Plaintiff's Reply to Defendant's Memorandum in Support of Cross–

---

**2.** More specifically, Gerald L. Bepko is being sued in his official capacity as Vice–President of IUPUI; G. Chris Keeley is being sued in her official capacity as Director of the Personnel Department at IUPUI; Theresa S. Martin is being sued in her official capacity as Labor Relations Representative at IUPUI; and Mr. Mc-Adams is being sued in his official capacity as Manager of the Stock Division of the IUPUI–IU Medical Center.

Motion for Summary Judgment [Plaintiff's Reply] at 6–11.

## II. ELEVENTH AMENDMENT IMMUNITY

■ Because a finding of complete immunity would obviate the need for the court to further address the substance of the plaintiff's claims, the court turns first to the Eleventh Amendment issue. The defendants' immunity argument basically pivots around their assertion that, because Indiana University is an "alter ego" of the state of Indiana, the university's officials are immune from suit for money damages by virtue of the Eleventh Amendment. The plaintiff questions, however, whether Indiana University and IUPUI are entitled to share in the state's Eleventh Amendment immunity.[3] Furthermore, he argues, Congress overrode the state's immunity by enacting 42 U.S.C. § 1983. Even assuming the Eleventh Amendment fully applies to the defendants, the plaintiff asserts that those of his claims that are equitable must survive.

These various arguments in fact raise three distinct subsidiary issues which must be addressed separately in order for the court to make a determination of the Eleventh Amendment's impact on this case. First, this court must determine whether Indiana University and IUPUI are entitled to assert Eleventh Amendment immunity at all—for if they are not, the court must then turn directly to the substance of the plaintiff's claims. If the universities generally do enjoy Eleventh Amendment immunity, the second question must be whether or not that immunity has been waived for the purpose of section 1983 claims. Third, if the immunity has not been waived, the court must determine which of the plaintiff's claims are barred by that immunity and which of the claims survive.

A. *The Applicability of the Eleventh Amendment to Indiana University and IUPUI*

The Eleventh Amendment to the Constitution of the United States declares:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

Despite the express language of the Amendment, the Supreme Court has consistently held that the Eleventh Amendment also grants to states immunity from suits in federal court when their *own* citizens are plaintiffs. *Lincoln County v. Luning,* 133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766 (1890); *Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). Thus, "[a]s the Amendment has been construed, it prohibits suit against a state by a citizen of another state, a citizen of the state itself, or an alien, except where the state has consented to suit."[4] C. Wright, *Law of Federal Courts* § 109 at

---

**3.** The court notes that, at first blush, the plaintiff's Eleventh Amendment argument seems to be inherently inconsistent with his substantive claims. In order to properly state a due process claim, the plaintiff has necessarily alleged that his rights were violated by a *state* action when he was terminated by IUPUI. Yet, when it comes to Eleventh Amendment immunity, the plaintiff reverses his argument, asserting that IUPUI is not really part of the state at all. The two arguments, however, are not unavoidably contradictory. In the context of the Fourteenth Amendment and section 1983, "state" action has been read broadly to include actions by states *or* their political subdivisions (counties, cities, etc.) *See, e.g., Monell v. Department of Soc. Serv.,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978). In the context of the Eleventh Amendment, however, "state" has been read narrowly—*only* the states themselves are enti-

tled to Eleventh Amendment immunity; their political subdivisions are not. *See, e.g., Mount Healthy School District v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Lincoln County v. Luning,* 133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766 (1890). Thus, it is entirely possible for an entity to be subject to Fourteenth Amendment restrictions without being entitled to Eleventh Amendment immunity.

**4.** Congress can also remove a state's Eleventh Amendment immunity by legislating under section 5 of the Fourteenth Amendment. *See, e.g., Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). Congressional removal of state immunity is discussed more thoroughly below in the context of section 1983. *See* § II.B., *infra.*

767–68 (1983). As a general matter, Indiana has not waived its immunity. *See* Ind. Code § 34–4–16.5–5(d).

In determining whether an entity is an "alter ego" of the state for Eleventh Amendment purposes, state law should be given primary consideration. *See Wellman v. Trustees of Purdue University,* 581 F.Supp. 1228, 1229 (N.D.Ind.1984) (citing *Mount Healthy City School District v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed. 2d 471 (1977)). The ultimate determination, however, clearly raises a question of federal law. *See Miller–Davis Co. v. Illinois State Toll Highway Authority,* 567 F.2d 323, 330 (7th Cir.1977) (noting that a "state would have too much self-interest in extending sovereign immunity to as many of its agencies and corporate creations as possible to allow local laws to be determinant.") Therefore, whether Indiana University and IUPUI are entitled to claim immunity under the Eleventh Amendment can properly be determined by this court.

Neither party has cited to the court any published state or federal case that directly addresses the question of Indiana University's entitlement to Eleventh Amendment immunity. Likewise, the court's own research has failed to discover any such precedent. The court finds a highly appropriate analogy, however, in two federal cases that deal with the Eleventh Amendment immunity of another university located in Indiana, Purdue University.[5] *See Kashani v. Purdue University,* 813 F.2d 843 (7th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 141, 98 L.Ed.2d 97; *Wellman v. Trustees of Purdue University,* 581 F.Supp. 1228 (N.D.Ind.1984). *See also Riggin v. Board of Trustees of Ball State University,* 489 N.E.2d 616, 632 (Ind.App. 1986) (finding by state court—without much helpful discussion—that Ball State University is entitled to share in the state

of Indiana's Eleventh Amendment immunity).

■ The jurisdictional bar of the Eleventh Amendment protects only the state and its agencies; it does not protect political subdivisions such as counties or cities. The question for this court, therefore, is whether Indiana University " 'is more like a county or city than it is like an arm of the State.' " *Kashani,* 813 F.2d at 845 (quoting *Mount Healthy School District v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). As the *Kashani* court notes, numerous cases have addressed the question of whether state universities enjoy Eleventh Amendment immunity, and the vast majority have found state universities to be forfended by the Amendment. *See Id.* (citing authority). Given this consistency, "it would be an unusual state university that would not receive immunity." *Id.* Yet, courts must reexamine the immunity issue with regard to the particular facts of each case "because the states have adopted different schemes, both intra and interstate, in constituting their institutions of higher learning." *United Carolina Bank v. Board of Regents,* 665 F.2d 553, 557 (5th Cir.1982).

Despite the inherently fact-sensitive nature of the question, the Seventh Circuit has identified two primary criteria a court should look to in deciding the issue of immunity. First, and most importantly, the court should look at "the extent of the entity's financial autonomy from the state." *Kashani,* 813 F.2d at 845. Second, the court should also consider the "general legal status of the University." *Id.* at 846–47. Applying these criteria, the court finds that Indiana University and IUPUI are instrumentalities of the state of Indiana and that they, therefore, share in its sovereign immunity.

---

**5.** The court takes judicial notice of the intense rivalry that exists between partisans of Indiana University and Purdue University. Realizing that many such persons would bristle at the very suggestion that the two schools are in any way analogous or interchangeable, the court wishes to emphasize the extremely limited nature of its "highly appropriate analogy" between Indiana and Purdue universities. The two schools are being considered analogous *only* in the area of Eleventh Amendment immunity. This case should not be cited in future skirmishes, therefore, for the proposition that the two schools are in any other way comparable— in basketball, football, or otherwise.

### 1. *Indiana University's Financial Dependence on the State*

In determining whether an entity is more like a city or county than it is like an agency of the state, the single most important factor to be considered is that entity's financial relationship with the state. "[A] crucial question in determining whether the suit should be regarded as one against the state is whether the named defendant has such independent status that a judgment against the defendant would not impact the state treasury." *Ronwin v. Shapiro*, 657 F.2d 1071, 1073 (9th Cir.1981), *quoted in Kashani*, 813 F.2d at 845.

Like Purdue, Indiana University receives substantial annual appropriations from the state of Indiana. Indeed, for the 1988–89 fiscal year, Indiana University was allocated approximately $300 million by the state. 1987 Ind. Acts. 3562–64 (Indiana Public Law No. 396). Indiana University receives such a large quantity of its income directly from the state that it is considered one "of the several universities of the state of Indiana which are supported by appropriations made by the general assembly." Ind. Code § 20–12–1–1.

Furthermore, the state of Indiana has placed numerous restrictions on the university's power to obtain additional monies and on its power to spend both those additional monies and the state-appropriated funds. Again like Purdue, Indiana University has no power to levy taxes. As the *Kashani* court declared:

> The absence of the power to tax is a strong indication that an entity is more like an arm of the state than like a county or city, because that enablement gives an entity an important kind of independence. The absence of that authority, for an entity like Purdue, ensures ultimate fiscal reliance upon the state.

*Kashani*, 813 F.2d at 846 (citing precedent). In addition to depriving Indiana University the power to tax, Indiana state law also limits the university's power to charge certain students tuition, *see, e.g.,* Ind. Code § 20–12–19.5–1 (providing free tuition at state-supported institutions for children of law enforcement officers and firemen killed in the line of duty); Ind. Code § 20–12–23–10 (providing that two students from each of Indiana's counties shall be able to attend Indiana University without payment of any contingent fees), and requires Indiana University to provide certain potentially costly services without charging a fee. *See, e.g.,* Ind. Code § 20–12–20–1 (requiring Indiana University to provide blind students reading assistants free of charge). Because of these and other restrictions, Indiana University is limited in the means by which it can raise additional money. It can enter one of the various markets, *see, e.g.* Ind. Code § 20–12–6–6 (the bond market);[6] Ind. Code § 20–12–1–2(e) (the market for higher education); it can accept gifts, *see* Ind. Code § 20–12–4–1; or it can borrow the money, *see* Ind. Code § 20–12–6–6.

Even given Indiana University's limited methods of raising funds, the state also significantly limits the university's power to spend its money, however obtained. Indiana's Budget Agency Law, Ind. Code §§ 4–12–1–1––4–12–1–17, expressly includes Indiana University in the definition of a "state agency." *See* Ind. Code § 4–12–1–2(d). As a "state agency," Indiana University is required

> to prepare and file a detailed statement of all expenditures it made in the last bugetary period or expects to find necessary in the next budgetary period. The statement must show reasons for all expenditures, "showing particularly the reason for any requested increase or decrease over former appropriations." [Ind. Code § 4–12–1–7(3)] The Budget Agency is empowered to require the submission of additional information and to hold hearings. The Budget Agency analyzes the statement and submits its recommendations to the legislature.

---

**6.** Indiana University can only issue bonds, however, with the specific approval of the state budget committee, the budget agency, and the governor. Ind.Code § 20–12–6–16. Such an issuance also requires a general, biannual approval by the state legislature. Ind.Code § 20–12–6–17.

*Kashani,* 813 F.2d at 846. Therefore, like Purdue, Indiana University would be required to report the payment of a judgment to the legislature as part of its financial report. Furthermore, under Ind. Code § 20–12–0.5–8, the Commission for Higher Education is empowered to review Indiana University's appropriation requests and to make recommendations to the governor and the legislature. On a more specific level, Indiana law limits the uses to which Indiana University can put its money. Proceeds from real estate sales must be kept in a separate fund and devoted only to prescribed uses. Ind. Code § 20–12–5–2. Any contract (valued at more than $50,000) that is financed "in whole or in part" by the issuance of bonds must be approved by the budget agency and the governor. Ind. Code § 20–12–6–15. Specific statutes also limit the projects that the university can undertake without the governor's approval. Ind. Code § 20–12–5.5–2.

All of these factors indicate that, although the state treasury would not write out a check to Mr. Shannon if he were to prevail on his claims,

> the payment would directly affect the state treasury. Indiana has not created an entity with a separate financial basis; it has created one that is dependent upon and functionally integrated with the state treasury.

*Kashani,* 813 F.2d at 846. Therefore, the extent of Indiana University's financial autonomy from the state of Indiana (or, rather, the lack thereof) "strongly indicates that [Indiana University] is entitled to Eleventh Amendment immunity." *Id.*

### 2. *The General Legal Status of Indiana University*

In analyzing the issue of Indiana University's independence from the state of Indiana, *Kashani* dictates that this court consider the general legal status of the university, as well as the state's financial constraints on the school. Unfortunately, Indiana's statutes and cases do not provide consistent guidance on this issue. Despite some equivocation, however, the most crucial factors seem to indicate that Indiana

University's general legal status is as an agency of the state.

Those indicators that point to Indiana University's existence as an entity separate from the state include the Indiana Tort Claims Act and the Indiana Supreme Court case of *Sendak v. Trustees of Indiana University,* 254 Ind. 390, 260 N.E.2d 601 (1970). As the United States District Court for the Northern District of Indiana found in *Wellman v. Trustees of Purdue University,* 581 F.Supp. 1228 (N.D. Ind.), the Indiana Tort Claims Act expressly defines the term "political subdivision" as including a "state college or university." Ind. Code § 34–4–16.5–2(5)(vii). A "political subdivision" is, in turn, specifically excluded from the definition of "state agency." Ind. Code § 34–4–16.5–2(7). As *Wellman* notes, however, the impact of this statutory distinction between state colleges and universities on the one hand, and the state of Indiana on the other, is blunted by the Act's express declaration that the Indiana Tort Claims Act should not be read as waiving any Eleventh Amendment immunity: "Nothing contained in this chapter shall be construed as a waiver of the eleventh amendment...." Ind. Code § 34–4–16.5–5(d), *quoted in Wellman,* 581 F.Supp. at 1230. In *Sendak,* the Indiana Supreme Court determined that Indiana University was not bound by Article 11, Section 12 of the Constitution of Indiana, which states that the state of Indiana may not "become a stockholder in any corporation." Although *Sendak* might be cited for the proposition that the Indiana Supreme Court found Indiana University to be an entity separate from the state and, as such, the university should not be entitled to share in the state's immunity, at least two factors counsel against such an interpretation. First, the court's ruling in *Sendak* was based in part on the "dual capacity" of Indiana University's trustees: both "as directors and managers of the University's Operation" and "as trustees of private trusts created by private donors." *Sendak,* 260 N.E.2d at 602. A finding that the state constitutional prohibition does not apply to the Trustees in their latter capacity does not necessarily mean that they are not

part of the state when acting in their capacity "as directors and managers of the University's operation." Second, the *Sendak* court was careful to distinguish Indiana University from such "political corporations" as towns, cities, and counties, *Id.* 260 N.E.2d at 604—making it very difficult to regard *Sendak* as indicating that Indiana University " 'is more like a county or city than it is like an arm of the State.' " *Kashani*, 813 F.2d at 845 (quoting *Mount Healthy School District v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

In contrast to these relatively weak indications that Indiana University should be considered as an entity separate from the state, most factors suggest that Indiana University's general legal status is as an agency of the state. Perhaps most significantly, a majority of the university's trustees are selected by the governor of Indiana. Ind. Code § 20-12-24-3; *see also Kashani*, 813 F.2d at 847.[7] Moreover, the Indiana legislature clearly retains the power to amend or repeal the duties and powers of the Trustees through future legislation.

Also significant is the fact that in *Mount Healthy School District v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Supreme Court looked to whether an entity claiming immunity served the state as a whole or served only a region of the state. Indiana University "educates students from all parts of the state. The local powers that it has are granted it to enable it to perform that function." *Kashani*, 813 F.2d at 848. The court also notes that Indiana courts have found that committees that are part of Indiana University are also agencies of the state of Indiana. *See, e.g., Allen v. Scherer*, 452 N.E.2d 1031 (Ct.App. Ind.1983). Therefore, given Indiana's financial constraints on Indiana University and further given the general legal status of the university, this court has no difficulty in finding that Indiana University is an instrumentality of the state such that it is entitled to assert Eleventh Amendment immunity.

### 3. The Significance of Indiana University's Immunity for IUPUI and the Named Defendants

Although not addressed by the defendants, the next question the court must consider is that of the relationship between IUPUI and Indiana University. The plaintiff's complaint states that the defendants are being sued in their official capacities as employees of IUPUI, not of Indiana University. Thus, if IUPUI were a legal entity separate from Indiana University, the fact that Indiana University is entitled to Eleventh Amendment immunity would be irrelevant to the plaintiff's claims.

It is abundantly clear, however, that IUPUI is nothing more than a regional campus of Indiana University, under direct control of Indiana University's trustees. Prior to 1969, both Indiana and Purdue Universities had regional campuses in Indianapolis. *See, e.g.,* 1967 Ind. Act 1128. Beginning in 1969 the Indiana General Assembly requested that the two schools work toward the unification of the two campuses. 1969 Ind. Acts 1684-85. That unification was accomplished and the newly created entity was put under the control and fiscal authority of Indiana University. *See, e.g.,* 1971 Ind. acts 2186 (appropriating funds for "Indiana University—Indianapolis campus—IU-PUI"). Therefore, IUPUI is not a legally distinct entity from Indiana University. A suit against an official of IUPUI is, in actuality, just as much a suit against Indiana University as would be a suit against an official of Indiana University's main campus in Bloomington. *Cf. Neel v. Indiana University Board of Trustees*, 435 N.E.2d 607 (Ind.Ct.App.1982) (treating a suit against the Indiana University School of Dentistry in Indianapolis as a suit against Indiana University itself).

As a general matter the named defendants in the case at bar are entitled to assert

---

7. Indiana University's Board of Trustees consists of nine members. Five are selected and appointed by the governor. Ind.Code § 20-12-24-3. A sixth student member is selected by the governor from a list of at least ten candidates submitted by a special search and screen committee. Ind.Code § 20-12-24-3.5. The remaining three members are elected by the university's alumni. Ind.Code § 20-12-24-2.

Indiana University's Eleventh Amendment immunity because they are being sued in their "official capacities." *See Sheets v. Indiana Dep't of Corrections*, 656 F.Supp. 733, 736 (S.D.Ind.1986) (citing authority). Whenever a suit is brought only against persons in their official capacities, a question arises as to whether the suit is actually against the state itself. The Eleventh Amendment bars suits against state officials when "the state is the real, substantial party in interest." *Ford Motor Co. v. Department of Treasury of Indiana*, 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945).

> The general rule is that a suit is against the sovereign if "the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration," or if the effect of the judgment would be "to restrain the Government from acting, or to compel it to act." [8]

*Dugan v. Rank*, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963) (citations omitted). In light of this court's previous finding that a damage award in this case would directly impact the state treasury, it is clear that the named defendants in this case are generally entitled to Eleventh Amendment immunity when acting in their official capacity.

### B. *The Impact of Section 1983*

■ The second major issue that this court must address in the Eleventh Amendment context is the plaintiff's contention that, even if the defendants generally enjoy immunity, that immunity has been congressionally removed for the purpose of section 1983 claims. *See* Plaintiff's Reply at 9–11. The Supreme Court has expressly held that Congress can in fact remove a state's Eleventh Amendment immunity when Congress is legislating pursuant to section 5 of the Fourteenth Amendment. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). The *Fitzpatrick* Court declared:

[W]e think that the Eleventh Amendment, and the principle of state sovereignty which it embodies, ... are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment. In that section Congress is expressly granted authority to enforce "by appropriate legislation" the substantive provisions of the Fourteenth Amendment, which themselves embody significant limitations on state authority.... We think that Congress may, in determining what is "appropriate legislation" for the purpose of enforcing the provisions of the Fourteenth Amendment, provide for private suits against states or state officials which are constitutionally impermissible in other contexts.

*Id.* at 456, 96 S.Ct. at 2671. A "necessary predicate" to any determination that particular federal legislation removes a state's immunity, however, is a finding of "congressional intent to abrogate the immunity conferred by the Eleventh Amendment." *Id.* at 451–52, 96 S.Ct. at 2669. The Court found just such congressional intent in section 706(g) of Title VII. 42 U.S.C. § 2000e–5(g) (1970 Ed., Supp. IV). Therefore, pursuant to *Fitzpatrick*, Title VII plaintiffs can sue a state for money damages despite the Eleventh Amendment.

Mr. Shannon has not brought his claims under Title VII. He argues by analogy to *Fitzpatrick*, however, that Congress has also removed state immunity for section 1983 claims. "Since Congress enacted 42 U.S.C. [§] 1983 within its power delineated in section 5 of the Fourteenth Amendment to enforce due process, there is no sovereign immunity applicable to the Defendants in this cause of action, pursuant to *Fitzpatrick*." Plaintiff's Reply at 10. The fundamental flaw with the plaintiff's analogy, however, is that it has been expressly considered and rejected by the Supreme Court. *See Quern v. Jordan*, 440 U.S. 332, 341, 99 S.Ct. 1139, 1145, 59 L.Ed.2d 358 (1979) (stating that "we simply are unwilling to believe ... that Congress intended

---

**8.** There is, of course, a very important and highly relevant exception to this general rule for suits challenging the constitutionality of a state official's action. *See Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The impact of this exception is discussed more thoroughly below. *See* § II.C., *infra*.

by the general language of § 1983 to override the traditional sovereign immunity of the states.") (reaffirming *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)). Therefore, the defendants are entitled to the full benefits of the Eleventh Amendment in opposing Mr. Shannon's section 1983 action.

### C. *The Impact of Ex Parte Young and Its Progeny*

The third and final issue the court must address in the context of the Eleventh Amendment is the plaintiff's contention that, even though applied in full, sovereign immunity does not bar all of his claims for relief. The defendants apparently concede as much. *See* Defendant's Memorandum in Support at 8 (stating that "the only relief to which Shannon may obtain, if he is successful, is prospective injunctive relief in the form of reinstatement"). Through a self-evident fiction, the Supreme Court has created a limited but very important exception to Eleventh Amendment immunity in those cases challenging the constitutionality of a state official's action.[9] *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *see also Pennhurst State School v. Halderman,* 465 U.S. 89, 102, 104 S.Ct. 900, 909, 79 L.Ed.2d 67 (1984). The exception, however, is not complete. Under *Ex Parte Young* certain actions challenging the constitutionality of a state official's action are allowed, while others are not. As it has been interpreted, the distinction is basically a functional one, whereby the Court has attempted to disallow those suits which will interfere with the state's legitimate functions as a sovereign. Stated very roughly, the *Ex Parte Young* doctrine bars suits seeking retroactive damages from officials but allows suits seeking prospective relief from those same officials.

*See Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Quern v. Jordan,* 440 U.S. 332, 337, 99 S.Ct. 1139, 1143, 59 L.Ed.2d 358 (1979). This line is obscured somewhat, however, by the difficulty in determining whether seemingly prospective relief might have an unallowable retroactive impact on the state treasury. *See, e.g., Edelman,* 415 U.S. at 663–64, 667, 94 S.Ct. at 1355–56, 1357–58 (stating that "the difference between the type of relief barred by the Eleventh Amendment and that permitted under *Ex Parte Young* will not in many instances be that between day and night.") The distinction has been further muddied by the Court's declaration that "an ancillary effect on the state treasury" is permissible under *Ex Parte Young. Id.* at 668, 94 S.Ct. at 1358. Therefore, the court must examine each of Mr. Shannon's claims and determine whether it is barred by the Eleventh Amendment in light of the *Ex Parte Young* doctrine.

### 1. *Damages*

Mr. Shannon's claim for $1.5 million in damages is relatively easy to address: This is clearly the very type of relief the *Ex Parte Young* doctrine forbids. *See Akins v. Board of Governors of State Colleges and Universities,* 840 F.2d 1371 (7th Cir.1988). Even though four officials are named in the plaintiff's complaint, "[i]t is not pretended that these payments [of the $1.5 million] are to come from the personal resources of these [defendants]. [The plaintiff] expressly contemplate[s] that they will, rather, involve substantial expenditures from the public funds of the state...." *Edelman,* 415 U.S. at 665, 94 S.Ct. at 1356 (quoting *Rothstein v. Wyman,* 467 F.2d 226 (2d Cir.1972), *cert. denied,* 411 U.S. 921, 93 S.Ct. 1552, 36 L.Ed.2d 315 (1973)). The Supreme Court has expressly declared "that a suit in federal

---

**9.** Under *Ex Parte Young,* a suit such as Mr. Shannon's challenging the constitutionality of a state official's action is not considered as a suit against the state. The theory behind *Ex Parte Young* is that the official's unconstitutional action is *ultra vires* and that, therefore, the official will not be afforded "any immunity from responsibility to the supreme authority of the United States." *Ex Parte Young,* 209 U.S. at 160, 28 S.Ct. at 454. Because the state could not

properly authorize an unconstitutional action, the official is "stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct." *Id.* The fiction, of course, is that this "individual" can still be sued under the Fourteenth Amendment—a constitutional restraint that applies exclusively to *state* actions and *not* to the actions of "individuals."

court by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment." *Quern v. Jordan,* 440 U.S. 332, 337, 99 S.Ct. 1139, 1143, 59 L.Ed.2d 358 (1979) (citing *Edelman* and other precedent).

## 2. *Reinstatement*

■ As the defendants necessarily concede, *see* Defendant's Memorandum in Support at 8, Mr. Shannon's claim for reinstatement to his former employment is just as clearly *not* barred by the *Ex Parte Young* doctrine. *See Kashani v. Purdue University,* 813 F.2d 843, 848 (7th Cir. 1987). An injunction ordering reinstatement "is clearly prospective in effect and thus falls outside the prohibitions of the Eleventh Amendment." *Elliott v. Hinds,* 786 F.2d 298, 302 (7th Cir.1986).

## 3. *Backpay*

■ The question of whether the *Ex Parte Young* doctrine allows a claim for backpay is made complicated only by the plaintiff's apparent misreading of *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). The plaintiff cites *Edelman* for the proposition that "Eleventh Amendment immunity should not preclude an award of backpay to the Plaintiff" because such an award would be equitable in nature and "would only have an 'ancillary effect' on the state treasury." Yet the *Edelman* Court declared:

> We do not read *Ex Parte Young* or subsequent holdings of this Court to indicate that any form of relief may be awarded against a state officer, no matter how closely it may in practice resemble a money judgment payable out of the state treasury, so long as the relief may be labeled "equitable" in nature....
>
> \*   \*   \*   \*   \*   \*
>
> While the Court of Appeals described this retroactive award of monetary relief as a form of "equitable restitution," it is in practical effect indistinguishable in many aspects from an award of damages against the State. It will to a virtual certainty be paid from state funds, and

not from the pockets of the individual state officials who were the defendants in the action. It is measured in terms of a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials.

*Edelman,* 415 U.S. at 666, 668, 94 S.Ct. at 1357, 1358.

Additionally, plaintiff's argument that "[i]t is the clear intention of Congress to provide backpay for victims of employment discrimination," Plaintiff's Reply at 7 (citing "42 U.S.C. § 2000(e)–2 (Title VII)") is equally inapposite. This suit is not a Title VII case. Furthermore, as was explained earlier, any analogy to Title VII for Eleventh Amendment purposes is erroneous given the fact that immunity has been congressionally removed for Title VII purposes, but remains intact for section 1983 claims. See § II.B., *supra.* Therefore, in light of *Edelman,* the plaintiff's claim for the equitable restitution of backpay is barred by the Eleventh Amendment.

## 4. *Attorney's Fees*

■ Finally, the plaintiff's complaint seeks reasonable attorney's fees pursuant to 42 U.S.C. § 1988. Although not cited by the plaintiff, the Supreme Court has also expressly addressed this question and has declared that "the substantive protections of the Eleventh Amendment do not prevent an award of attorney's fees against ... officers in their official capacities." *Hutto v. Finney,* 437 U.S. 678, 692, 98 S.Ct. 2565, 2574, 57 L.Ed.2d 522 (1978); *see also Maher v. Gagne,* 448 U.S. 122, 130–31, 100 S.Ct. 2570, 2575, 65 L.Ed.2d 653 (1980). Therefore, the plaintiff's claims for reinstatement and attorney's fees survive the defendants' invocation of the Eleventh Amendment. His claims for damages and backpay, however, are barred by the immunity of the defendants.

## III. PROCEDURAL DUE PROCESS

The court now turns to the substance of the plaintiff's claims. Mr. Shannon first claims that his termination by IUPUI violated his constitutional right to procedural

due process. As this court has only recently observed, it is well established that

> [t]he threshold question under any Fourteenth Amendment due process claim ... is whether the plaintiff has been deprived of a cognizable life, liberty, or property interest. *See Board of Regents v. Roth,* 408 U.S. 564 [92 S.Ct. 2701, 33 L.Ed.2d 548] (1972). [The plaintiff] makes no life or liberty claims, so the question before the court is whether the plaintiff had any protectible property interest in his job.

*Delaney v. Carmichael,* 670 F.Supp. 255, 259 (S.D.Ind.1987). It is equally well settled that property interests that are entitled to procedural due process protection "are created and their dimensions ... defined by existing rules or understandings that stem from an independent source such as state law." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *see also Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976) (declaring that "the sufficiency of the claim of entitlement must be defined by reference to state law"); *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985) (reaffirming *Roth*). Thus, this court must determine whether, under the law of Indiana, Mr. Shannon had any cognizable property interest in his continued employment with IUPUI.

Mr. Shannon argues that, as a matter of law, his continued employment by the defendants rose to the level of a protectible property interest. He urges that, "under Indiana law, when cause is required before an employment termination, there exists a property interest[ ] as protected by the Due Process Clause." Plaintiff's Brief in Support at 4 (citations omitted). The plaintiff further contends that Personnel Policy Section 30–B "is sufficient to confer a property interest, since the handbook constitutes 'rules and understandings' which form an

independent source for the property interest ... [the p]laintiff was entitled to his job, absent cause, under the employee handbook." *Id.* The defendants counter, however, that "Indiana courts have consistently refused to find property rights in the provisions of employee handbooks standing alone." Defendants' Memorandum in Support at 10. Because "Indiana law is firmly rooted in the employment at will doctrine," *id.,* the defendants urge that they are entitled to summary judgment in their favor on the plaintiff's procedural due process claim.[10]

### A. Creation of a Property Interest Through the Employee Handbook

■ As noted earlier, IUPUI's personnel handbook, section 30–B states:

> An employee may be suspended without advance notice and without pay subject to discharge without further notice at the end of five workdays of suspension for just cause.

Parties' Joint Statement, Exhibit A. The plaintiff strenuously argues that the handbook's statement that employees may only be discharged for "just cause" constitutes an "existing rule[ ] or understanding[ ]"—an existing rule or understanding adequate to form an independent source for Mr. Shannon's alleged property interest in his continued employment with IUPUI. Plaintiff's Brief in Support at 4. As a matter of abstract theory this argument by the plaintiff has a certain amount of logical force. *See, e.g., Paige v. Harris,* 584 F.2d 178, 181 (7th Cir.1978) (finding that an employee handbook issued by the federal Department of Housing and Urban Development "provides just the type of 'rules and understandings' ... which would justify [a] 'legitimate claim of entitlement to continued employment.'"); *cf. State ex rel. Warzyniak v. Grenchik,* 177 Ind.App. 393, 379 N.E.2d 997 (1978) (stating that "[w]hen 'cause' is required before an employment relationship may be altered (to the detri-

---

10. The court notes with displeasure that the defendants' argument in this area is actually nothing more than a copious, unedited quotation from an unpublished court opinion. By simply presenting a three-page block quote to this court, the defendants failed to make clear their key arguments and, in fact, presented to the court several totally irrelevant arguments—thus requiring the court to do the work that is more properly that of counsel.

ment of the employee), due process protections attach.") As discussed above, however, in determining a state employee's property interest in continued employment, this court must make reference to *state law*—and Indiana courts have been unequivocal in their rejection of alleged property rights based on employee handbooks. In *Mead Johnson and Co. v. Oppenheimer*, 458 N.E.2d 668 (Ind.Ct.App.1984), the Court of Appeals of Indiana declared "[e]mployee handbooks are immaterial without an enforceable agreement between the employer and employee of employment for a definite duration." *Id.* at 671. This declaration was based heavily on *Shaw v. S.S. Kresge Co.*, 167 Ind.App. 1, 328 N.E.2d 775 (1975), in which the Court of Appeals had said:

> Even assuming, *arguendo*, that the handbook relied upon by appellant constituted a part of the contract, in the absence of a promise on the part of the employer that the employment should continue for a period of time that is either definite or capable of determination, the employment relationship is terminable at the will of the employer. There being no binding promise on the part of the employee that he would continue in the employment, it must also be regarded as terminable at his discretion as well. For want of mutuality of obligation or consideration, such a contract would be unenforcible in respect of that which remains executory.

*Id.* 328 N.E.2d at 779 (citations omitted). This rule regarding employee handbooks is entirely consistent with Indiana's general common law pronouncements pertaining to employment relationships. "In Indiana, the employment relationship is terminable at will unless there is a promise of employment for a fixed duration or consideration given by the employee in addition to her services." *Streckfus v. Gardenside Terrace Co-Op*, 481 N.E.2d 423 (Ind.Ct.App. 1985), *vacated on other grounds*, 504 N.E. 2d 273 (Ind.1987). *See also, Tri–City Comprehensive Community v. Franklin*, 498 N.E.2d 1303, 1305 (Ind.Ct.App.1986) (stating the Indiana rule that "[w]here the tenure of service is indefinite or cannot be determined by the terms of the employment contract, the employment is at will and may be terminated at any time by either party"). Therefore, under Indiana law, in order for Mr. Shannon to be able to assert the property rights allegedly granted by Policy 30–B, he would have to show that he and IUPUI had entered into "an enforceable agreement ... of employment for a definite duration." Because the plaintiff has stipulated that his employment with IUPUI was "for an indefinite term," however, *see* Parties' Joint Statement at 1, that part of his summary judgment motion based on the alleged property interest created by IUPUI's employee handbook must necessarily be denied.

B. *Creation of a Property Interest Through the "Common Law" of IUPUI*

■ Despite the defendants' apparent contrary belief, *see* Defendants' Memorandum in Support at 11, the court's finding that an employee handbook standing alone is inadequate under Indiana law to create a protectible property interest does not inexorably lead to the conclusion that the defendants' cross motion for summary judgment must be granted. Questions of material fact have remained incompletely addressed by both parties such that genuine issues remain to be resolved. The threshold question before the court is whether Mr. Shannon had any protectible property interest in his continued employment with IUPUI. Such property interests are created by "rules or mutually explicit understandings."[11] *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed. 2d 570 (1972); *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). These understandings, in turn, can be manifested in either express or implied contracts. Either type of con-

---

**11.** It is clear, however, that despite the plaintiff's assertion to the contrary, *see* Plaintiff's Brief in Support at 4–5; Plaintiff's Reply at 1, longevity in a position of employment *cannot* create a protectible property interest. *Hadley v. County of DuPage*, 715 F.2d 1238, 1244 (7th Cir.1983); *Biddle v. City of Fort Wayne*, 591 F.Supp. 72, 83 (N.D.Ind.1984).

tract may serve to create a protectible property interest. *See Perry*, 408 U.S. at 601, 92 S.Ct. at 2699. The parties in this case have stipulated that no express contract of employment existed between Mr. Shannon and IUPUI. *See* Parties' Joint Statement at 1. Furthermore, the court has found that, in the absence of a binding promise on the part of the employee that he would continue in the employer's employment for a fixed duration, an employee handbook is inadequate under Indiana law to create either an express or an implied contract. *See* § III.A., *supra.* The plaintiff has hinted, however, that the court might still be able to find an implied contract in this case. Indeed, the Supreme Court has declared that an implied contract of continued employment (and a corresponding legitimate claim of entitlement) might also be created by "the policies and practices of the [employing] institution." *Perry*, 408 U.S. at 602, 92 S.Ct. at 2700. In *Perry* the Court declared that

> [an employee] who has held his position for a number of years, might be able to show from the circumstances of this service—and from other relevant facts— that he has a legitimate claim of entitlement to job tenure. Just as this Court has found there to be a "common law of a particular industry of a particular plant" that may supplement a collective-bargaining agreement, so there may be an unwritten "common law" in a particular university that certain employees shall have the equivalent of tenure.

*Id.* at 602, 92 S.Ct. at 2700 (citations omitted). Because the issue has remained incompletely addressed by either party in this case, a question of material fact remains as to whether such an unwritten

"common law" existed at IUPUI with respect to employees like Mr. Shannon.[12] Given that such a question of material fact continues to exist, granting a complete summary judgment in favor of the defendants would be inappropriate at this time. Thus, the defendants' motion for summary judgment on the plaintiff's procedural due process claim is granted only to the extent that the court finds, as a matter of law, that the IUPUI employee handbook did not create a protectible property interest in Mr. Shannon's continued employment. The factual and legal question of whether such an entitlement might have been created by the "common law" of IUPUI remains open.[13]

## IV. SUBSTANTIVE DUE PROCESS

The second claim made by the plaintiff is that IUPUI's "termination of [Mr. Shannon] was not rational, and was further arbitrary and unfair." Plaintiff's Brief in Support at 10. He argues that IUPUI's actions, therefore, violated his right to substantive due process. The plaintiff asserts that, furthermore, this court is collaterally estopped by the Indiana Employment Security Division's "prior determination that the discharge of plaintiff by Defendants was without just cause [and] constitutes termination on an irrational basis which is arbitrary and fundamentally unfair." *Id.* The defendants counter by pointing out that the precedent relied on by the plaintiff for his collateral estoppel argument was recently reversed by the Indiana Supreme Court, *see* Defendants' Supplemental Authority in Opposition to Plaintiff's Motion for Summary Judgment, and by arguing that the plaintiff's

---

**12.** This remaining question of material fact also raises at least two more related questions, one of fact and one of law. First, it is clear that an implied contract such as one that might be created by the "common law" of an employing institution is still a true contract, subject to the same conditions for formation as express contracts. *See Dyer Construction Co. v. Ellas Construction Co.,* 153 Ind.App. 304, 287 N.E.2d 262, 263 (1972). Thus, there would be a question of fact as to whether those conditions of creation were met—for instance, whether there was adequate consideration and mutual assent. Even if a "common law" of employment existed at IUP-

UI, the lingering question of law that remains— as always—is whether such a set of facts would be adequate to create an enforceable implied contract as a matter of *Indiana state law. See Perry,* 408 U.S. at 602 n. 7, 92 S.Ct. at 2700 n. 7.

**13.** Of course, if this court were to find that Mr. Shannon had a protectible property interest in his job, the question of what type of process he was due in relation to IUPUI's deprivation of that property would also have to be addressed at that time.

dismissal was not "arbitrary." *See* Defendants' Brief in Support.

The court finds that at this time it is unnecessary to address either the plaintiff's substantive due process claim or the subsidiary collateral estoppel issue. The Seventh Circuit has made it clear that, just as with a procedural due process claim, the threshold question under any claim of a substantive due process violation must be whether the plaintiff has been deprived of a cognizable liberty or property interest. In affirming the dismissal of a complaint alleging a substantive due process violation, Judge (now Justice) Stevens speaking for the court declared:

> Certainly the constitutional right to "substantive" due process is no greater than the right to procedural due process. Accordingly, the absence of any claim by the plaintiff that an interest in liberty or property has been impaired is a fatal defect in her substantive due process argument.
>
> \* \* \* \* \* \*
>
> There is nothing in any of the opinions [cited by the plaintiff] ... explaining why the absence of either a property or liberty interest should not be fatal to a substantive as well as a procedural due process claim.

*Jeffries v. Turkey Run Consolidated School District,* 492 F.2d 1 (7th Cir.1974); *see also Brockert v. Skornicka,* 711 F.2d 1376, 1382 (7th Cir.1983) (stating that a "[p]laintiff's right to due process, substantive or procedural, depends on the existence of a relevant property or liberty interest."); *Eichman v. Indiana State University Board of Trustees,* 597 F.2d 1104 (7th Cir.1979) (stating that "[a]s this court has explicitly held, there can be no claim of a denial of due process, either substantive or procedural, absent deprivation of either a liberty or property right.") Therefore, given that the resolution of this threshold question is still pending, see § III, *supra,*

it would be premature for this court to look at the issue of the alleged irrationality and arbitrariness of Mr. Shannon's termination.[14] If it is eventually found that Mr. Shannon did have a cognizable property interest in his continued employment with IUPUI, the balance of his substantive due process claim will then be addressed.

### V. CONCLUSION

The parties' cross-motions for summary judgment on the defendants' assertion of Eleventh Amendment immunity are each DENIED IN PART and GRANTED IN PART. The plaintiff's claims for damages and backpay are barred; his claims for reinstatement and attorneys fees survive. Because under Indiana law an employee handbook standing alone cannot serve to create a protectible property interest in continued employment, the plaintiff's procedural and substantive due process claims must fail to the extent that they are based on the language of IUPUI's employee handbook. Given, however, that a genuine issue of material fact continues to exist as to whether the plaintiff was given a protectible property interest by the "common law" of IUPUI's employment practices, the parties' cross-motions for summary judgment on the plaintiff's claims are hereby DENIED.

In addition, in order to facilitate the most efficient resolution of these remaining questions, the court hereby ORDERS that, from the date of this Entry, the parties shall be given an additional ten (10) days to file any supplementary summary judgment motions on the question of Mr. Shannon's property interest in his continued employment. If such a motion is filed, the other party shall have seven (7) days to respond, and the movant shall have an additional three (3) days to reply. The court wishes to make clear that this order is not an invitation to the parties to further address those issues which have already been fully briefed or which have already been decided

---

14. Although in theory it certainly would have been possible for Mr. Shannon to premise his substantive due process claim on a different liberty or property interest than that on which he premised his procedural due process claim,

he chose not to. Thus, the threshold question for both claims is exactly the same: did Mr. Shannon have a protectible *property* interest in his continued employment?

by the court. Any subsequent pleadings and accompanying affidavits should be narrowly limited to further elaborating the issue of the "common law" of IUPUI's employment practices and its possible role in creating a protectible property interest.