Fred ST. JOHN, Plaintiff,

v.

TOWN OF ELLETTSVILLE, by and through its duly authorized and elected Town Council; and Douglas L. Deford, Michael D. Cornman, Herbert E. Ray, Donald Ashley, and D. Geraldine McIntyre, individually, Defendants.

No. IP 97–1415–C B/S.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Jan. 5, 1999.

David L. Ferguson, Ferguson Ferguson & Lloyd, Bloomington, Indiana, for plaintiff.

Edward J. Liptak, Miller Carson Box-berger & Murphy LLP, Bloomington, Indiana, for defendant.

## ENTRY GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

BARKER, Chief Judge.

Plaintiff, Fred St. John ("St.John"), alleges that the personnel policy adopted by the Ellettsville Town Council conveyed to him a property right in his continued employment as chief operator of Ellettsville's wastewater treatment plant. St. John brings a claim under 42 U.S.C. § 1983 against the defendants, the Town of Ellettsville ("Town") and five members of its Town Council in their individual capacities, contending that defendants violated his Fourteenth Amendment right to due process by terminating his job without providing him notice and a meaningful opportunity to be heard. In addition to the federal claim, St. John brings a state law claim for breach of contract against the Town, contending that the Town's personnel policy, adopted as a Town ordinance, served as an employment contract that defendants breached by failing to follow the progressive disciplinary steps set forth in the personnel policy. St. John adds two state law claims against Town Council President Douglas DeFord in his individual capacity, defamation and invasion of privacy, which both hinge on a statement he made to a newspaper reporter. Defendants respond to the federal due process claim and the state law breach of contract claim by contending that the Town's personnel policy did not create an employment contract and that St. John was an at-will employee without a property interest in his continued employment. Further, defendants claim that the defamation and invasion of privacy claims must fail since St. John never

demonstrated that DeFord's statement placed St. John in a false light. Defendants also invoke various forms of immunity, including qualified, legislative, and discretionary function immunity. Defendants move for summary judgment on all claims. Plaintiff counter-moves for summary judgment on the procedural due process and breach of contract claims. For the reasons discussed below, defendants' motion for summary judgment is *GRANTED* on the state law breach of contract, defamation, and invasion of privacy claims. Both plaintiff's and defendants' motions for summary judgment are *DENIED* on the § 1983 due process claim.[1]

### I. Background[2]

Plaintiff, Fred St. John, operated the Town of Ellettsville wastewater treatment facility from September 17, 1984, until the Town Council voted to eliminate his position on October 9, 1995. *See* V. Compl. ¶¶ 10, 28. While the job of chief operator of a sewage plant may not to some seem glamorous, an efficient and legally compliant wastewater treatment facility is essential to the successful management and growth of a town or municipality. If a town's sewage plant fails to meet the state's compliance guidelines, a "sewer ban" can, in fact, stop all new development in its tracks. In the midst of such a threat from the Indiana Department of Environmental Management ("IDEM"), the Ellettsville Town Council apparently decided to terminate St. John from his post and get out of the business of managing sewage altogether, by deciding to contract with a private management firm to operate its sewage plant.

In December 1989, the Town Council passed an ordinance amending its personnel policy ("manual") and distributed the revised version to its employees, including

1. St. John accedes to dismissal of Counts four, five, and seven of the Verified Complaint, so we *GRANT* defendants' motion for summary judgment as to those claims.

2. We glean most of this background from our own independent review of the parties' few exhibits, due mainly to the parties' lack of development of the record.

St. John.[3] *See* V. Compl. ¶ 11; Pl.'s Ex. A (December 30, 1989 Town Council minutes). On January 25, 1990, St. John signed an acknowledgment that he had received the manual and understood its contents. *See* Pl.'s Ex. B. The Council subsequently amended the personnel policy at least five additional times between 1990 and 1995. *See* Pl.'s Ex. C.

The manual addresses a variety of topics, such as hiring practices, promotions, work hours, vacation and sick leave, and, of course, discipline. *Id.* The manual distinguishes between four groups of town personnel, which include police personnel, fire department personnel, utility office employees, and "[w]ater, [s]ewer, and [s]treet" employees. The manual specifically focuses on police and fire department personnel, as special requirements, procedures, and protections apply uniquely to them.

The "Discipline" section lists thirteen offenses that, if committed by an employee, "shall" result in immediate termination. *Id.* § 255–50(a). The subsection includes a fourteenth catch-all provision that requires immediate termination for "[a]ny action which, while not a violation of a regularly established rule, regulation, or policy, is so deleterious to efficient Town operation or to the public interest that discipline or discharge could reasonably be expected to result." *Id.* A second subsection entitled "Uniform Disciplinary Policy" provides for progressive discipline of employees who violate a "regular established policy or procedure." *See* Pl.'s Ex. C, § 255–50(b). The general "Discipline" section lists only three possible violations that could result in the progressive discipline for sewer workers—tardiness, unexcused absences,

and safety violations.[4] *See* Pl.'s Ex. C., § 255–50(c)–(e). In contrast, a separate subsection under the "Discipline" heading, pertaining only to police and firefighters, lists fifty-seven different employee violations, divided into "major" and "minor" offenses, that will result in discipline. *See* Pl.'s Ex. C., § 255–50(f). Although police officers and firefighters have their own discipline subsection, including much more extensive procedural requirements modeled after a widely-recognized state statute, the "Uniform Disciplinary Policy" presumably applies to them as well.

Discipline ranges from oral reprimands, which a supervisor may give an employee at any time, to immediate termination for a third offense. An employee who commits a second offense within one month of the first will be placed on disciplinary probation and suspended from one to three days or demoted. The manual defines probationary employees as those employees "who do not have any expectation or right to continued future employment. A probationary employee may be terminated for any reason or no reason at all, provided that it is not an unlawful reason, or a reason that violates these policies and procedures or other agreements." *See* Pl.'s Ex. C., § 255–20.

In addition to being placed on probation for violations of regularly established policies or procedures, an employee is on probationary status during the first six months of any reassignment, caused by such events as promotion, transfer or layoff. Also, all newly hired employees are probationary during their first year of employment with the Town. The manual differentiates between probationary and nonprobationary employees in that the latter

---

3. Although St. John claims that the personnel policy is not an employee manual or handbook, we disagree with his semantic characterization. The personnel policy even refers to itself as a "manual." Pl.'s Ex. B.

4. Upon review of the manual, we have identified a few more ways a sewer department employee may run afoul of a "regular estab-

lished policy or procedure" as set out in the manual: (1) not wearing a clean uniform, (2) not showering before leaving a work area, (3) untimely reporting of accidents, (4) abusing some type of leave, and (5) improperly completing time sheets. Several of these offenses also could qualify as one of the fourteen bases prompting immediate termination.

are not eligible for maximum pay for the given position until expiration of the probationary year, which may be extended in individual cases. Any of the three types of employees—regular, temporary or seasonal—may begin as probationary or assume that status.

The manual provides for a grievance procedure if "an employee has problems relating to his/her job or fellow employees." *See* Pl.'s Ex. C., § 255–55(g). The procedure requires a complaining employee first to report the problem to his/her supervisor. If a resolution is not reached within ten days of such notification, the aggrieved party or the supervisor may submit the problem in writing to the Town Board of Trustees, by either certified mail or hand delivery. A member of the Town Board designated as a grievance officer then reviews the matter, when all parties concerned may present their positions concerning the grievance. The Town Board "shall then at a Public meeting take any official action necessary."[5] *Id.*

On the morning of Monday, August 14, 1995, Town Council President Doug DeFord apparently instructed St. John to resign or face termination, telling him that his employment situation would be discussed that evening at a public Town Council meeting. *See* V. Compl. ¶ 18. That evening, St. John attended the meeting and the Council informed him that there were concerns about his job performance.[6] *See* Pl.'s Ex. J. St. John addressed the Council and demanded a typed list of the "allegations." Pl.'s Ex. E (August 14, 1995 Town Council minutes); *see*

DeFord Aff., Ex. A (August 28, 1995 Ellettsville Town Council minutes).

The Town Council minutes reflect that the Council apparently had discussed reasons for St. John's possible termination at an "executive" Council meeting the previous week, which St. John had not attended. *Id.* Because the Council had not prepared a typed list of its concerns for the August 14 meeting, it was unable to accommodate St. John's request. *Id.* St. John also requested a 30–day medical leave from his job, which the Council apparently allowed. St. John further requested that the Council schedule an executive session to discuss the matter, which it set for September 14, 1995, the date St. John's one-month medical leave was due to expire.[7] *Id.* The Council also considered who could substitute as plant operator during St. John's absence. The Council voted 5–0 to appoint a private contractor, Bynum Fanyo Utilities, to oversee the sewer plant operations until the September 14 executive session. As of August 14, 1995, St. John remained in the Town's employ.

In an effort to provide St. John with details about the Council's concerns relating to his operation of the sewage plant, Susan Stevens conducted a site visit of the sewage plant on August 17, three days after the August 14 Council meeting.[8] *See* Defs.' Ex. F. Her August 18, 1995 memorandum to the Council explained a host of gross inefficiencies that she believed developed during St. John's supervision of the facility and that threatened "severe potential fines and sewer bans" by IDEM. *Id.*

Corroborative of Ms. Steven's forewarnings, ten days later on August 28, the

---

5. The parties do not inform us if St. John exhausted the grievance procedures.

6. Neither party informs us about the factual specifics of the meeting.

7. Executive council sessions are routine, although closed to the public. The Council utilizes the executive session to discuss sensitive matters needing to be shielded from the public eye, such as the personnel issues typified by this case.

8. Plaintiff believes, apparently erroneously, that IDEM conducted an inspection of the sewage plant on August 17. Although Defendants do not identify Stevens' position, it is clear that her August 18 "interoffice memorandum" is not the result of an IDEM inspection, but rather is more akin to an internal audit by the Town.

Town received notice that IDEM had drafted a sewer ban proposal that would halt all main extensions to the Town's sewer line. *See* DeFord Aff., Ex. A (August 28, 1995 Town Council minutes). Also on August 28, the Council voted to privatize the management operations of the sewage plant by entering into a five-year contract with Bynum Fanyo Utilities at an estimated total savings of about $20,000.[9] *Id.* The contract provided that Bynum Fanyo would be responsible for treatment plant operations and operations maintenance, which would include keeping the plant in compliance with its discharge permit, maintaining records and reporting plant data to IDEM. *Id.*

On September 6, 1995, the Town Council, through its attorney, sent a typed letter to St. John's attorney that incorporated the Town's concerns by referencing a number of documents. *See* Pl.'s Ex. I. The letter states that the Council's "concerns are accurately reflected in various documents and, rather than repeating those concerns, I am incorporating by reference the deficiencies listed in the enclosed documents."[10] *Id.*

On September 25, 1998, the Bloomington Herald–Times published a front-page article entitled "Ellettsville in danger of sewer hook-on ban, Town officials scrambling to clean up problems before state stops growth," which forms the basis of St. John's defamation and invasion of privacy claims. *See* Pl.'s Ex. G.

On the morning of October 9, 1995, St. John and his attorney met with the Town Council in a private executive session.[11] *See* Pl.'s Ex. J. That afternoon, the Town Council notified St. John's attorney that it would discuss St. John's status as an employee that evening during a public Town Council meeting. That afternoon, St. John's attorney faxed a two page response to the Town's attorney warning that negative references to St. John's work performance would warrant a defamation lawsuit. The faxed letter also complained that termination of St. John's employment at the meeting would, in his opinion, violate the procedures set forth in the Town's employee manual. *Id.*

On the evening of October 9, 1995, the Town Council conducted its public meeting, during which the Council discussed routine town business, including St. John's employment status. The Council voted 5–0 to "eliminate the position of operator at the Ellettsville Waste Water Treatment plant." *See* Pl.'s Ex. K.

## II. Discussion

### A. Summary Judgment Standards

Summary judgment is appropriate if "the pleadings, depositions, answers to in-

---

9. St. John moves to strike the portions of DeFord's affidavit that recapitulate the August 28 meeting, which DeFord attended. While St. John correctly claims that the Council officially speaks through its duly organized meetings, DeFord may testify about events within the scope of his personal knowledge. *See Scott v. City of Seymour,* 659 N.E.2d 585, 590 (Ind.Ct.App.1995). Moreover, DeFord's affidavit merely authenticates the minutes of that meeting, without adding or altering the conclusion of the Council as described in those minutes. If DeFord attempts to testify at trial about events beyond his personal knowledge or otherwise runs afoul of the rules of evidence (St. John makes no such objections here), we will revisit the issue accordingly. For purposes of summary judgment, we need only rely on the official minutes, so we *DENY* plaintiff's motion to strike as moot.

10. The enclosed documents included: copies of job descriptions for the plant operator, maintenance, and the chief plant operator, a daily routine for the sewage plant, the August 18, 1995 letter from Susan Stephens detailing plant deficiencies, six letters from IDEM dating from July 10, 1991 to July 27, 1995, and a letter from Bynum Fanyo to IDEM dated October 18, 1994. The parties have provided us with the Stephens letter only *sans* additional enclosures.

11. For reasons neither party explicates, the executive session originally scheduled for September 14, 1995, apparently did not occur until the morning of October 9, 1995. We know no details about the events that transpired during the meeting.

terrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the particular issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Eiland v. Trinity Hosp.,* 150 F.3d 747, 750 (7th Cir.1998). Yet, neither the mere existence of some alleged factual dispute between the parties, *Baulos v. Roadway Express, Inc.,* 139 F.3d 1147, 1152 (7th Cir. 1998), nor the existence of "some metaphysical doubt as to the material facts," *Fairchild v. Forma Scientific, Inc.,* 147 F.3d 567, 571 (7th Cir.1998) (internal quotations omitted) (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)), is sufficient to defeat a motion for summary judgment.

In considering a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the non-movant. *See Spraying Sys. Co. v. Delavan, Inc.,* 975 F.2d 387, 392 (7th Cir.1992). Thus, if genuine doubts remain, and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enters., Inc. v. First Chicago Corp.,* 975 F.2d 1290, 1294 (7th Cir.1992); *Wolf v. City of Fitchburg,* 870 F.2d 1327, 1330 (7th Cir.1989). Only issues of fact that could affect the outcome of a case are "genuine" such that they may save a case from summary judgment. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Tolle v. Carroll Touch, Inc.,* 23 F.3d 174, 178 (7th Cir. 1994). Therefore, if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his case, summary judgment is not only appropriate, but also required. *See Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552; *Herman v. City of Chicago,* 870 F.2d 400, 404 (7th Cir.1989).

*B. Procedural Due Process Claim and State Law Breach of Contract Claim*

St. John asserts that the defendants deprived him of his Fourteenth Amendment procedural due process rights, in violation of 42 U.S.C. § 1983, when they eliminated his position as operator of the Ellettsville sewer plant. He claims that the Town's personnel policy created a property interest in his continued employment such that the Town could not eliminate it without providing him due process of law.

It is well-settled that a court confronting a federal procedural due process question must make two separate inquiries. *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 1492–93, 84 L.Ed.2d 494 (1985). Initially, we must determine if St. John established that he had a property interest in his job of the sort that the Constitution protects. *See Border v. City of Crystal Lake,* 75 F.3d 270, 273 (7th Cir.1996). If so, the question becomes what process is due before he can be deprived of that interest. *See Fittshur v. Village of Menomonee Falls,* 31 F.3d 1401, 1405 (7th Cir.1994).

Regarding the first step, St. John bears the burden of establishing that he has a protected property interest in his continued employment. *See Larsen v. City of Beloit,* No. 97–1831, 1997 WL 754606, *4 (7th Cir. Dec. 5, 1997). Whether St. John possessed a substantive property interest in his job is a question of state law. *See Moulton v. Vigo County,* 150 F.3d 801, 804 (7th Cir.1998). Such property interests "are not created by the Constitution," but rather "are created and their dimensions ... defined by existing rules or understandings that stem from an independent source such as state law." *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). A protected property interest in employment can arise from

such sources as a state statute, municipal ordinance, an express or implied contract, legally binding rules or regulations, or the "unwritten common law" of employment—those "rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Moulton,* 150 F.3d at 804 (*quoting Lawshe v. Simpson,* 16 F.3d 1475, 1480 (7th Cir. 1994)); *Roth,* 408 U.S. at 577, 92 S.Ct. 2701.

### 1. The Employee Manual as a Contract Creating a Property Right

■ St. John claims that the employee manual, which the Town adopted by ordinance, created an employment contract with the Town that it breached by firing him without providing him due process. He contends that he possessed a right to and expectation of continued employment. Therefore, on our way to resolving the procedural due process claim, we must determine if the employment manual did indeed create such a right. *See Shannon v. Bepko,* 684 F.Supp. 1465, 1478–79 (S.D.Ind.1988) (finding that either express or implied contracts may create a protected property interest).

Historically, Indiana has recognized two basic forms of employment: (1) employment for a definite or ascertainable term,

and (2) employment at-will. *See Orr v. Westminster Village N., Inc.,* 689 N.E.2d 712, 717 (Ind.1997). An employee with an employment contract with a definite term may not be terminated before the end of the specified term except for cause or by mutual agreement, assuming the employer has not reserved the right to terminate the employment before the conclusion of the contract. *Id.* By contrast, "[i]f there is no definite or ascertainable term or employment, then the employment is at-will, and is presumptively terminable at any time, with or without cause, by either party." *Id.* (citations omitted).

Although the employment-at-will doctrine is only a rule of contract construction, not a rule imposing substantive limitations on the parties' freedom to contract, the presumption of at-will employment is "strong" in Indiana, and its courts are "disinclined to adopt broad and ill-defined exceptions to the employment-at-will doctrine." *Id.*

Neither party contends that St. John had an employment contract with the Town for a definite or ascertainable term. Moreover, St. John does not claim that any of the three recognized exceptions to the employment-at-will doctrine applies in this case.[12] Rather, the parties, both of whom rely upon the holding in *Orr,* dispute

---

12. Under Indiana law, the three narrow exceptions to the employment-at-will doctrine include: (1) an employment contract supported by adequate independent consideration, (2) an employer's contravention of a clear statutory expression of a right or duty, and (3) the employee's invocation of promissory estoppel, including his/her pleading of its elements with particularity. *See Orr,* 689 N.E.2d at 718. St. John recognizes these exceptions but does not claim that they apply to his case, as he admits that he "is only concerned with the *Duldulao* criteria," discussed *infra.* Pl.'s Resp.Summ.J. at 10. Interestingly, St. John alleges in his complaint, without subsequent evidentiary support or explanation, that his continued employment was dependant upon his signing the employment manual and that he continued working after signing the employment manual in reliance on the manual. *See* V. Compl. ¶¶ 31–33; Pl.'s Resp.Summ.J. at 4, 12. If St. John attempts

to assert promissory estoppel, he falls well short of asserting the claim with sufficient particularity for us to address it. *See Orr,* 689 N.E.2d at 718. In any event, the record is barren of any meaningful evidence that St. John relied to his detriment upon the manual. Likewise, if St. John attempts to establish that his continued employment constituted adequate independent consideration for an employment relationship terminable only for cause, that claim must fail as well. St. John does not allege that he "provided anything to [the defendants] other than [his] services." *Id.; see also Stack v. Allstate Ins. Co.,* 606 F.Supp. 472, 475 (S.D.Ind.1985) (under Indiana law, "[i]f an employment contract is supported by adequate independent consideration (other than the employee's promise to render services), it may be enforced though it does not establish a definite term of employment").

whether the Town's employee manual constitutes a valid unilateral contract that gives St. John the right to continued employment.

In *Orr*, the Indiana Supreme Court expressly declined to consider whether an employee handbook could ever constitute a valid unilateral contract between employer and employee:

> We are also aware that this Court has not expressly addressed and resolved the question of whether unilateral contracts in the employment context always require adequate independent consideration and whether an employee handbook can ever constitute a unilateral contract serving to modify the otherwise at-will employment relationship. Nevertheless, we decline plaintiffs' invitation to use this case as a vehicle for resolving these questions.

*Orr*, 689 N.E.2d at 719–20 (citations and footnotes omitted). However, the court did "reaffirm the vitality of the employment-at-will doctrine in Indiana and the general rule that adequate independent consideration is necessary to convert an at-will relationship into an employment relationship requiring an employer to discharge an employee for good cause." *Id.* at 722. The court ultimately decided that the employee manual could not create a valid unilateral contract on the facts of that case—that is, after it assumed *arguendo* that a unilateral contract in the

absence of adequate independent consideration could modify an employee's at-will employment status.[13] We need not assume so much. Despite the opportunity to do so, the Court in *Orr* neither disturbed nor retreated from the vast body of Indiana law recognizing that employee manuals lacking a definite term and adequate independent consideration cannot create employment contracts that alter the at-will employment relationship. Hence, as far back as *Shaw v. S.S. Kresge Co.*, 167 Ind.App. 1, 328 N.E.2d 775, 778–79 (1975) (citations omitted), the Indiana Court of Appeals held that the terms of an employee handbook are irrelevant unless the employment contract is one for a definite term:

> [T]here is no question that the employee had rendered services over a period of approximately three years; and that the employer would be bound to compensate him for such services so far as they had been rendered and received. Even assuming, *arguendo*, that the handbook relied upon by appellant constituted a part of the contract, in the absence of a promise on the part of the employer that the employment should continue for a period of time that is either definite or capable of determination, the employment relationship is terminable at the will of the employer. There being no binding promise on the part of the employee that he would continue in the employment, it must also be regarded as

13. St. John cites the Illinois Supreme Court's decision in *Duldulao v. Saint Mary of Nazareth Hosp. Ctr.*, 115 Ill.2d 482, 106 Ill.Dec. 8, 505 N.E.2d 314, 318 (1987), arguing that the Town personnel manual satisfied its three part test for determining if an employee manual constitutes a valid unilateral employment contract. Although the court in *Orr* discussed *Duldulao* because of the plaintiffs' primary reliance on it, *Duldulao* is not the law in Indiana and the court in *Orr* did not adopt its holding. Such an adoption would eviscerate the adequate independent consideration requirement and create a fourth exception to the employment-at will doctrine for employee handbooks, results the Indiana Supreme Court clearly declined to embrace. The Indiana Supreme Court eventually may de-

cide that an employee handbook without a definite term may create a valid unilateral employment contract in the absence of adequate independent consideration—and follow *Duldulao* in the process—but we will not apply the *Duldulao* factors until and unless that day has arrived. Suffice it to say, however, that neither party expends significant effort analyzing the interrelated manual provisions to determine if an employee in St. John's position would reasonably believe that the manual was an offer for continued employment and progressive discipline. *See Duldulao*, 106 Ill.Dec. 8, 505 N.E.2d at 318–320; *Campbell v. City of Champaign*, 940 F.2d 1111, 1112 (7th Cir.1991) (questioning the reasoning of *Duldulao* ).

terminable at his discretion as well. For want of mutuality of obligation or consideration, such a contract would be unenforcible [sic] in respect of that which remains executory.

Employee handbooks have fared no better in Indiana during the ensuing years, as courts have declined to uphold handbooks as employment contracts altering the at-will employment relationship absent either a definite term of employment or the employee's providing adequate independent consideration in addition to the services to be rendered. *See Wior v. Anchor Indus., Inc.,* 669 N.E.2d 172, 178 n. 6 (Ind.1996) ("We also affirm the trial court regarding its conclusion that [defendant's] Employee Handbook does not create a claim since [plaintiff] provided no additional independent consideration."); *Shannon v. Bepko,* 684 F.Supp. at 1478 (finding that "Indiana courts have been unequivocal in their rejection of alleged property rights based on employee handbooks"); *Rice v. Rent–A–Center of America, Inc.,* 664 F.Supp. 423, 426–27 (N.D.Ind.1987) (applying Indiana law and finding that the employer's operations manual was not an enforceable employment contract since it neither contained an identifiable term of employment nor was supported by "any separate consideration beyond [the plaintiff's] mere promise to render services"); *Stack v. Allstate Ins. Co.,* 606 F.Supp. at 475 (similar); *Tri–City Comprehensive Community Mental Health Ctr., Inc. v. Franklin,* 498 N.E.2d 1303, 1305 (Ind.Ct.App.1986) (rejecting plaintiff's claim that an employee handbook without a definite tenure of service created a unilateral contract, finding that the "courts of this state have rejected [contract] arguments based upon the existence of employee handbooks which set out

certain procedures to be followed in disciplining or terminating employees"); *Hostettler v. Pioneer Hi–Bred Int'l, Inc.,* 624 F.Supp. 169, 172 (S.D.Ind.1985) (under Indiana law, "in the absence of a promise for employment for a definite period of time, the existence or non-existence of any provision of the employee handbook is immaterial"); *Mead Johnson & Co. v. Oppenheimer,* 458 N.E.2d 668, 671 (Ind.Ct. App.1984) ("Employee handbooks are immaterial without an enforceable agreement between the employer and employee of employment for a definite duration."); *Ryan v. J.C. Penney Co., Inc.,* 627 F.2d 836, 836–38 (7th Cir.1980) ("Indiana law is settled without a promise of employment for a definite term or consideration beyond services rendered, no enforceable employment contract is created.") [14]; *Campbell v. Eli Lilly & Co.,* 413 N.E.2d 1054, 1062–63 (Ind.Ct.App.1980) (recognizing *Kresge* and holding that personnel manual did not create an enforceable covenant); *cf. Seco Chems., Inc. v. Stewart,* 169 Ind.App. 624, 349 N.E.2d 733, 737–38 (1976) (although an employee manual was not at issue, the court held that a unilateral employment contract was formed when a discharged employee both had agreed to work for the employer for a fixed period of time and had provided independent adequate consideration for the contract by abandoning his prior employment).

Unless the Indiana Supreme Court holds otherwise, it is not our role to alter this state's long-standing approach to employee handbooks or question its propriety. *See Afram Export Corp. v. Metallurgiki Halyps, S.A.,* 772 F.2d 1358, 1370 (7th Cir.1985) ("Federal judges are disinclined to make bold departures in areas of the

---

**14.** *Tuthill Corp. v. Wolfe,* 451 N.E.2d 72, 75–78 (Ind.App.1983), recognized that an employee's future services may serve as consideration for an employer's oral offer to provide bonuses for job performance beyond a certain threshold. *Tuthill,* which did not involve an employee handbook, may be read consistently with the "adequate independent consideration" cases. Indeed, the court made it clear

that the employee's increased productivity "in addition to his normal employment services" constituted the consideration for the bonus agreement. *Id.* Indeed, the very idea of a "bonus" structure is to induce an employee to work above required levels and reap the rewards of marginal gains in corporate profits due in part to his/her extra efforts.

law that we have no responsibility for developing."). Since it is undisputed that the employment manual at issue neither contained a definite term of employment nor was supported by adequate independent consideration, we GRANT defendants' motion for summary judgment on the state law breach of contract claim.

### 2. The Employee Manual as an Ordinance Creating a Property Right

■ Our resolution of St. John's contract claim does not end our inquiry into whether St. John possessed a property interest in his job. While an employee manual/ordinance, depending on the law of the applicable state, may lack the technical elements required for contract formation, it nonetheless may evidence the type of "rules or mutually explicit understandings" that create property rights. See Perry v. Sindermann, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972). Our circuit has recognized that contracts are just one source from which property interests may derive: "[a] municipal ordinance also may create a property entitlement without regard to state contract law .... [r]ather than assimilate statutes and ordinances to contract law, we have continued

to recognize them as distinct sources of property entitlement." [15] Hohmeier v. Leyden Community High Schs., 954 F.2d 461, 464 (7th Cir.1992); see Perry, 408 U.S. at 601–02, 92 S.Ct. at 2699–700; Lawshe, 16 F.3d at 1481. While an ordinance, like a contract, may create property interests, "[i]n either case, the sufficiency of the claim of entitlement must be decided by reference to state law." Bishop v. Wood, 426 U.S. 341, 345, 96 S.Ct. 2074, 2078, 48 L.Ed.2d 684 (1976) (emphasis added).

We are reticent to grant summary judgment for either party on the basis of their respective anemic treatment of this issue, as both parties fixated on the contract aspect of the employee manual/ordinance.[16] Although summary judgment is inappropriate for either party at his time, we note for their sakes (again emphasizing that the parties' inadequate legal and factual development places us at a severe disadvantage) that we cannot foreclose the possibility that this ordinance evidenced "mutually explicit understandings" sufficient to establish St. John's property interest in his continued employment with the Town of Ellettsville.[17]

---

**15.** Since St. John makes no property interest claim based on an unwritten "common law" of the Town, we do not address the merits of this approach. See Shannon v. Bepko, 684 F.Supp. at 1478–79.

**16.** The plaintiff, of course, avers generally that the ordinance created a property right in his continued employment, but the only analysis he offers is conjoined with his contract claim. The defendants responded that the Indiana Supreme Court's decision in Orr disposed of the contract claim altogether. Despite that generous reading of Orr, it is clear that a federal due process issue was not before that court, and it did not opine on whether a lawfully adopted town personnel policy could ever be the type of ordinance, rule or regulation that evidences mutually explicit understandings creating property rights. Aside from Orr, neither party casts even so much as a glance at Indiana law, much less applies that law to the question of whether a property interest emanates from this employment policy as an ordinance and not as a contract.

**17.** Compare, e.g., Bishop v. Wood, 426 U.S. at 344–45, 96 S.Ct. at 2077–78 (holding that city personnel ordinance providing that permanent employees, as opposed to probationary employees, may be discharged for certain reasons "may fairly be read" on its face as conferring a guarantee of continued employment); Lawshe, 16 F.3d at 1481 (recognizing, under Indiana law, that a public employer's rules and regulations, if properly promulgated, could create property rights even where those rules and regulations failed to create an employment contract); Stewart v. Fort Wayne Community Sch., 564 N.E.2d 274, 280 (Ind. 1990) (finding that tenure conveyed to teacher by statute created a due process property right despite the absence of a contractual claim to continued employment), cert. denied, 502 U.S. 856, 112 S.Ct. 169, 116 L.Ed.2d 133 (1991); Sheridan v. Town of Merrillville, 428 N.E.2d 268, 272 (Ind.Ct.App.1981) (finding that a state statute, and a similar local ordinance, providing that employees "shall serve during good behavior" created property interest in continued employment); Town of

Assuming *arguendo* that, on the basis of the ordinance adopting the personnel manual, St. John possessed a protected property right in his continued employment with the Town, the question becomes what process is due before the Town can deprive him of that interest. Not surprisingly, the parties' analysis of the process afforded St. John suffers the same dereliction as their treatment of whether the ordinance created a property right. The parties have abdicated their obligation to address the legal requirements of due process or to develop a factual record for us to determine adequately whether the Town afforded St. John notice and a meaningful opportunity to be heard. In fact, neither party even mentions the familiar balancing approach of *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), much less attempts to assess the competing interests involved in altering the method by which the Town deprived St. John of his job. *See, e.g., Staples v. City of Milwaukee,* 142 F.3d 383, 385–87 (7th Cir.1998) (discussing due process requirements for public employees removable only for cause, in light of *Loudermill, Mathews,* and *Gilbert v. Homar,* 520 U.S. 924, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997)). Simply put, questions of material fact have remained incompletely addressed by both parties such that genuine issues remain to be resolved.

The interplay between the reasons proffered by the Town for terminating St. John creates practical difficulties in our exploring (without the aid of the parties) whether the procedures afforded St. John—mainly the October 9 hearing—satisfied due process.

On one hand, our reconstruction of the record reveals that the Council conveyed to St. John in a September 6, 1995, letter its concern with his job performance. The letter itself references various documents (only one of which the parties provided to us) without providing an explanation of concerns (save for the one document provided, we have no clue what performance-related "concerns" the documents may or may not reflect). The letter never mentions "privatization" of the plant even though the Council had apparently decided to privatize the operations of the plant, which effectively eliminated St. John's position, a week *before* he received the letter and well over a month before St. John met with the Council on October 9 regarding his employment status. Indeed, if the result of the October 9 hearing was a foregone conclusion (perhaps it was not), it is difficult to conceive how St. John's October 9 hearing was impartial and meaningful, as nothing he could say would alter his fate or enhance the "accuracy" of the process

*Speedway v. Harris,* 169 Ind.App. 100, 346 N.E.2d 646, 650 (1976) (finding that a town's "rules and regulations" manual that afforded "any member" a hearing before termination could give a probationary fireman a legitimate claim of entitlement to continued employment) *with Moulton v. Vigo County,* 150 F.3d 801, 805 (7th Cir.1998) (under Indiana law, a local ordinance may create property interests where state law does not, but finding no evidence of mutually explicit understandings creating property rights); *Border v. City of Crystal Lake,* 75 F.3d 270, 275–76 (7th Cir.1996) (finding that employee manual, construed as either a contract or ordinance, failed to create property rights; specific warnings that certain behavior would result in termination or other punishment did not limit the city's ability to punish for other reasons); *Miller v. Crystal Lake Park Dist.,* 47 F.3d 865, 867–68 (7th Cir.1995) (holding that

a municipal personnel manual, which provided for a four step grievance procedure and stated that employees may be removed "for just cause" failed to create a property interest; elected officials may establish standards for subordinates to follow without limiting their own discretion); *Fittshur v. Village of Menomonee Falls,* 31 F.3d 1401, 1406–07 (7th Cir.1994) (recognizing that village ordinance or employee handbook may create property rights, but finding the ordinance's language too discretionary to confer a property right and finding the handbook's distinction between probationary and regular employees insufficient to alter at-will employment); *Campbell v. City of Champaign,* 940 F.2d 1111, 1112 (7th Cir.1991) (city handbook listing various grounds for dismissal and endorsing progressive discipline failed to create property rights; the handbook existed to warn employees and not to confer rights).

(especially if St. John was not privy to the true reason motivation his termination). *Cf., e.g., Hostrop v. Board of Junior College Dist. No. 515,* 523 F.2d 569, 576 (7th Cir.1975) ("[T]he evidence leaves us with the definite and firm conviction that plaintiff was never offered a fair hearing on termination, and that, in fact, the board prejudged his case before making any hearing available to him."), *cert. denied,* 425 U.S. 963, 96 S.Ct. 1748, 48 L.Ed.2d 208 (1976).

On the other hand, the Town claims in its motion for summary judgment that its termination of St. John was financially motivated, as privatization would result in an expected savings of about $4,000 a year for each of the five years of its private contract (oddly, the Town never claims that its concern about a "sewer ban" prompted its decision to privatize). While the performance-related and financially-related reasons may be proper and consistent with each other, as the Council's view of St. John's performance may have prompted their decision to hire a private contractor to perform his job, the defendants never mention St. John's performance in their summary judgment motion and clearly imply that its "privatization" decision was unrelated to St. John individually. Hence, although St. John received some kind of hearing on October 9, 1995 (we know no details of what occurred), it is unclear if privatization and the Town's financial concerns were even discussed (never mind ever conveyed to St. John as a reason for his dismissal). And while the Town Council's possible legislative act of "privatizing" might satisfy due process requirements regardless of the October 9 hearing, that issue remains to be developed by the parties, as we discuss below.

The plaintiff barely scrapes the surface of a substantive analysis of the process he was given prior to his termination. In his Response Memorandum, St. John claims without explanation that he "was terminated without any process." See Pl.'s Resp. at 17. Under the procedural due process

count in his complaint, St. John contends that the Town terminated him in violation of its "own established policy for dealing with personnel matters." *See* V. Compl. ¶ 74. Of course, it is well established that "[It]he categories of substance and procedure are distinct .... '[p]roperty' cannot be defined by the procedures provided for its deprivation any more than can life or liberty." *Loudermill,* 470 U.S. at 543, 105 S.Ct. at 1493; *see Shvartsman v. Apfel,* 138 F.3d 1196, 1199 (7th Cir.1998). St. John's saving grace, however, is his passing contention (although still more thorough than defendant's due process analysis) that his October 9, 1995 meeting with the Council was not meaningful because: (1) the Council members had decided his fate well before the meeting by effectively eliminating his position when it voted to "privatize" the sewage plant, and (2) the Council never provided him a meaningful explanation of the charges against him.

Likewise, the defendants never reach the due process issue—they assume incorrectly that St. John cannot have a property interest in his job simply because the employee manual fails to create a valid unilateral employment contract. *See* Defs.' Mem.Supp.Summ.J. at 16.

The defendants also cite *Johnson v. City of Fort Wayne,* 91 F.3d 922, 943–44 (7th Cir.1996), in which the court found that a city's passage of an ordinance allowing demotions of "upper level policy" makers eliminated any property interest the plaintiff may have had in the elevated position. Defendants contend in abbreviated fashion that the Town Council divested St. John of any possible property interest by eliminating his job position altogether: "St. John was not, personally, terminated inasmuch as his position was eliminated and no longer exists ..., due process was not required where St. John's position itself was eliminated, rather than St. John being eliminated from the position." Defs.' Reply at 6. Plaintiff responds without elaboration that elimination of his position does not circum-

vent due process requirements. *See* Pl.'s Resp.Summ.J. at 16.

The parties argue around the implicit point of *Johnson v. City of Ft. Wayne,* never contemplating that the reason a legislature may completely eliminate property interests without offending due process notions is because the legislative process in some circumstances provides the plaintiff all the process that is due. Such is the case when Congress or a state legislature enacts a general statute that removes the underlying source of a property right. *See, e.g., Atkins v. Parker,* 472 U.S. 115, 129–30, 105 S.Ct. 2520, 2529–30, 86 L.Ed.2d 81 (1985) (congressional amendment altering eligibility for a national food stamp program "provid[ed] all the process that is due," but noting that the case did not concern the fairness of individual eligibility determinations); *Marusic Liquors, Inc. v. Daley,* 55 F.3d 258, 263 (7th Cir. 1995) (recognizing that "the normal legislative process satisfies the due process clause for making class-wide decisions"); *Burns Harbor Fish Co. v. Ralston,* 800 F.Supp. 722, 730–31 (S.D.Ind.1992) (internal quotations and citations omitted) (holding that in certain contexts the legislative and/or regulatory process affords sufficient process to satisfy due process concerns; "[w]here the legislature enacts general legislation eliminating statutory rights or otherwise adjusting the benefits and burdens of economic life," the legislative determination provides all the process due).

We cannot determine from the record before us whether the Council ever promulgated, through ordinance, its decisions either to "privatize" or to eliminate St. John's position, but the Town's end-run around its personnel policy confirms that the general source of the alleged property right, the handbook/ordinance, is still operative for employees whose positions still exist. Also, neither party informs us if the "privatization" decision affected only St. John, if other public employees continued working at the sewer plant, or how many employees were displaced.[18] Whether the actions of the Town Council qualify as legislative activity of the type satisfying due process remains to be developed by the parties. While town councils must be afforded policy-making latitude, "privatization" is not a magic word that decision-makers may invoke as a due process escape hatch. Accordingly, we *DENY* both parties' motions for summary judgment on

18. When a government body votes to eliminate only one job, that decision may be prone to predication upon the attributes of the individual holding the position at the time. While it may be impracticable to offer a meaningful hearing to each person whose property interest would be deprived by the passage of a general law (such as in the hypothetical case of a federal statute eliminating welfare payments), that concern is suspended when a government act removes a property interest only for one person. *See O'Bannon v. Town Court Nursing Ctr.,* 447 U.S. 773, 789 n. 22, 800–01, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980) (Blackmun, J., concurring) (" 'the case for due process protection grows stronger as the identity of the persons affected by the government choice becomes clearer' ") (*quoting* L. Tribe, American Constitutional Law § 10–7, pp. 503–04 (1978)). Moreover, while due process may be satisfied by competing parties (including the party potentially deprived of an interest) that are "heard" during state and federal legislative processes, we have no indication thus far that the Town Council heard from any soundboard advocating St. John's interest prior to its August 28 decision to "privatize" the operations dimension of the sewage plant. *See Bi–Metallic Investment Co. v. State Board,* 239 U.S. 441, 445–46, 36 S.Ct. 141, 60 L.Ed. 372 (1915) (general statutes affecting "more than a few people" may eliminate property rights since the electoral process affords procedural protection, but contrasting legislation affecting a "relatively small number of people, who were exceptionally affected" by the government action). Indeed, the electoral check on a legislature's decision, an essential ingredient to finding legislative due process, is minimized when that decision removes the property right of only one individual. *See Bricklayers Union Local 21 v. Edgar,* 922 F.Supp. 100, 108 (N.D.Ill.1996) (legislative process provided the union/plaintiff with due process since "one would have to be terminally naive to believe that unions and employers are not heard in the Illinois General Assembly and heard often in each session").

the § 1983 procedural due process issue.[19]

### C. Defamation and Invasion of Privacy Claims

■ St. John's remaining state law claims, defamation and invasion of privacy, both suffer so substantial an evidentiary infirmity that we must find for the defendant as a matter of law. First, we address the defamation claim. Under Indiana law, a plaintiff must prove the following elements in a defamation action: (1) a communication with defamatory imputation, (2) malice, (3) publication, and (4) damages. *See Long v. Durnil,* 697 N.E.2d 100, 106 (Ind.Ct.App.1998). A statement is defamatory if it tends to harm the reputation of another so as to lower him/her in the estimation of the community or to deter third persons from associating or dealing with him. *See Van Eaton v. Fink,* 697 N.E.2d 490, 494 (Ind.Ct.App.1998). "[T]o recover in an action for defamation, that which causes the alleged defamation must be both false and defamatory." *Kolczynski v. Maxton Motors, Inc.,* 538 N.E.2d 275, 276 (Ind.Ct.App.1989); *see Doe v. Methodist Hosp.,* 690 N.E.2d 681, 687 (Ind. 1997) ("Defamation rules apply, however, only to statements that are false as well as defamatory."); RESTATEMENT (SECOND) OF TORTS § 558 (1977). The determination of whether communication is defamatory is generally a question of law for the court. *See Van Eaton,* 697 N.E.2d at 494. The communication is to be viewed in context and given its plain and natural meaning, in reference to the idea it is calculated to convey to the addressee. *See Rambo v. Cohen,* 587 N.E.2d 140, 145 (Ind.Ct.App. 1992).

■ St. John contends that the following passage in the Bloomington Herald–Times newspaper provides the basis for both the defamation and invasion of privacy claims:

> [Town Council President] DeFord was shocked to learn of the violations IDEM outlined. "I thought it was unbelievable," he said. "As a board we are ultimately responsible. We just assumed everything was being done as it should be."

> When board members learned of the threat of heavy fines, they convinced state officials to give them a second chance to get things back on track.

> "There are these violations that the town has made that we are correcting and the board's feeling was that by privatizing those things will be taken care of," DeFord said. "I am not pointing any fingers, but there were things that went undone. And I am not saying anything about Fred St. John."

Pl.'s Ex. G.

St. John contends that DeFord's statement "I am not saying anything about Fred St. John" does just the opposite by associating St. John with "violations" and "things that went undone." V.Compl. ¶ 47–51. He claims, wholly without support, that the "statements and their reasonable imputations are false and were made intentionally and maliciously." *Id.* Thus, he concludes that DeFord's statements both defamed him and invaded his privacy by unreasonably placing him in a false light before the public. *Id.* at 53.

Strikingly absent from St. John's interpretation of DeFord's comments is any reference to the paragraph directly preceding the above passage, which reads: "Town council president Doug DeFord was reluctant to talk about St. John and the sewage plant operation. But he acknowledged problems and said that the town is scrambling to improve the situation, which will in turn help appease state officials." Pl.'s Ex. G. Understood in this light, DeFord's statements cannot reasonably be read as defamatory, as his hesitancy in discussing St. John is confirmed by his statement that he was not "saying any-

---

**19.** Likewise, we reserve judgment on the individual defendants' affirmative defenses of qualified and legislative immunity until the parties elucidate the undeveloped factual record and address the numerous neglected issues mentioned previously.

thing about Fred St. John." Viewed in the context St. John chose not to provide in his briefs, it is clear to us that the implication of DeFord's statement is not to associate St. John with "violations" and "things that when undone." *See Rambo*, 587 N.E.2d at 145 (noting that allegedly defamatory words must be construed "in light of the circumstances of their utterance").

 Even if DeFord's statements could reasonably be interpreted as defaming St. John, St. John comes nowhere close to demonstrating that DeFord uttered his statements falsely and with actual malice. In Indiana, even private figures must establish actual malice if the statements in question relate to an issue of public concern.[20] *See Jean v. Dugan*, 20 F.3d 255, 262 (7th Cir.1994) (noting that Indiana is among the "small minority" of states requiring private-figure plaintiffs to prove actual malice); *Aafco Heating & Air Conditioning Co. v. Northwest Publications, Inc.*, 162 Ind.App. 671, 321 N.E.2d 580 (1974) ("it makes no sense to draw the distinction between 'public officials' or figures and 'private' individuals in terms of defining the constitutional guarantees of free speech and free press"), *trans. denied*, *cert. denied*, 424 U.S. 913, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976). Here we are persuaded that DeFord's statements relate to a matter of quintessential public interest, as the management of the public sewer plant and the imposition of a "sewer ban" by IDEM bear directly on the town's ability to grow successfully and manage its development. Thus, the question becomes whether St. John has provided "clear and convincing" evidence from which a reasonable jury could conclude that DeFord acted with the requisite actual malice. *See Jean*, 20 F.3d at 263 (noting that under Indiana law, a federal court ruling on a defamation summary judgment motion must ask whether the evidence presented

is such that a reasonable jury might find that actual malice had been shown with convincing clarity); *Henrichs v. Pivarnik*, 588 N.E.2d 537, 542 (Ind.Ct.App.1992) (actual malice element must be shown with convincing clarity).

 Actual malice is present when the defendant acts with knowledge that the defamatory statement was false or with reckless disregard of whether it was false or not. *In re Atanga*, 636 N.E.2d 1253, 1259 n. 1 (Ind.1994) (*citing Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)); *Chang v. Michiana Telecasting Corp.*, 900 F.2d 1085, 1087–88 (7th Cir.1990) (discussing Indiana law). A plaintiff attempting to meet this actual malice standard must produce "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Moore v. University of Notre Dame*, 968 F.Supp. 1330, 1336 (N.D.Ind.1997) (discussing Indiana law) (internal quotations omitted) (*quoting St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)). It is not enough for St. John to allege that a defamatory falsehood has been published or that defendants acted carelessly. *Id.* at 1336–37. The burden of proving that DeFord acted with actual malice, "which is a very difficult and demanding burden, must be shouldered entirely by the plaintiff." *Id.*

 Against this backdrop, St. John offers no evidence, much less clear and convincing evidence, that DeFord believed that his statements were false or that he entertained serious doubts about the truth of St. John's involvement with "violations" or "things that went undone." Consonant with the parties' general treatment of issues in this case, St. John (or defendants, for that matter) never mentions the ele-

---

**20.** The parties do not address whether St. John's status as operator of the sewer plant qualifies him as a "public" figure or official under *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686

(1964). While St. John may very well be such a figure, we need not decide the issue since the distinction is irrelevant in Indiana when the statements at issue pertain to an issue of public interest.

ments of a defamation claim under Indiana law or addresses the actual malice standard. Even assuming that DeFord meant to imply that St. John managed the sewage facility poorly, the evidence does not indicate by convincing clarity that DeFord must have reached such a conclusion with serious doubts about its truth. The record is void of any effort by St. John to combat the host of plant deficiencies identified by Susan Stevens in her August 18, 1995, letter to DeFord and the Town Council, deficiencies she attributed to St. John's operation of the sewage plant prior to his August 14 medical leave. He offers no explanation why DeFord's comments would prove *a fortiori* that he harbored misgivings about their truth—after all, the Town apparently, or at least allegedly, faced an impending sewer ban on a plant that he had been charged with operating for the preceding eleven years.[21] We detail these points only to demonstrate that without the benefit of any argument from St. John on the actual malice element, the sparse record standing by itself does not contain clear and convincing evidence that DeFord acted with knowledge that the alleged defamatory falsehoods were false or that he made the statements with reckless disregard for whether they were false or not. Accordingly, plaintiff never confronts, never mind carries his "difficult and demanding" burden of proving actual malice, and we therefore *GRANT* defendants' motion for summary judgment on plaintiff's defamation claim.

St. John's "false light" invasion of privacy claim falls ill of the same superficial treatment he gives to his defamation claim. Once again, St. John fails to discuss the elements of the "false light" publicity strain of the general invasion of privacy tort. Indiana generally recognizes the tort of invasion of privacy, which typically involves four distinct strands: (1) unreasonable intrusion upon the seclusion of another, (2) appropriation of the other's name or likeness, (3) public disclosure of private facts, and (4) false light publicity. *See Cullison v. Medley,* 570 N.E.2d 27, 31 (Ind.1991); *Ellis v. Luxbury Hotels, Inc.,* 666 N.E.2d 1262, 1267 (Ind.Ct.App.1996); RESTATEMENT (SECOND) OF TORTS § 652A (1977). In *Doe v. Methodist Hospital,* 690 N.E.2d 681, 685 (Ind.1997), the Indiana Supreme Court cast doubt on its recognition of the "public disclosure of private facts" branch of the invasion of privacy tort, finding that recognition of "one branch of the privacy tort does not entail recognizing all four." Yet, the court acknowledged that Indiana precedent could be interpreted as recognizing false light invasion of privacy. *Id.* ("We think [*State ex rel. Mavity v. Tyndall,* 224 Ind. 364, 66 N.E.2d 755 (1946) ] need not be read as a recognition of anything more than false light invasion of privacy."). Our research reveals only two additional published Indiana cases involving the viability of a false light publicity claim, both of which implicitly recognize the general claim without specifying its elements, and neither of which found the plaintiff's respective

21. On July 10, 1995, St. John received a favorable performance evaluation from his supervisor, George Webb, whose job title and responsibilities remain unidentified. Webb signed the one-page evaluation over a month before Susan Steven's inspection of the wastewater facility revealed conditions that could warrant a sewer ban, and well over two months before the Herald–Times published the article ("Ellettsville in danger of sewer hook-on ban, Town officials scrambling to clean up problems before state stops growth") that contained the alleged defamatory statements. St. John fails to inform us of the period covered by the evaluation or its scope, if the evaluation serves only as a guide to adjust salaries, or the degree to which the evaluation reflects the input of the Town Council. In fact, he never mentions the evaluation in conjunction with the defamation or invasion of privacy claims. Ultimately, the fact that someone other than DeFord or a member of the Town Council favorably evaluated St. John does not bind DeFord to that conclusion, foreclose discovery of additional facts altering that conclusion, guarantee that circumstances will remain static, or demonstrate that DeFord doubted the veracity of his statements allegedly associating St. John with "violations" and "things that went undone."

claims meritorious. *See Near East Side Community Org. v. Hair,* 555 N.E.2d 1324, 1335 (Ind.Ct.App.1990) ("Because [plaintiffs] do not state in their complaint that these allegations are false, we find that they have not stated a claim for false light publicity."); *Furno v. Citizens Ins. Co. of America,* 590 N.E.2d 1137, 1141 (Ind.Ct.App.1992) (finding that defendant's general statement comparing chiropractics and orthopedics did not refer to the plaintiff, concluding that the defendant "has not stated a claim for [false light] invasion of privacy").

However, the combination of the Restatement (Second) of Torts and the Seventh Circuit's application of Illinois law (also predicated on the Restatement) provides sufficient parameters for us to gauge St. John's claim in the absence of Indiana law on the subject. Hence, the Restatement (Second) of Torts describes the false light tort in the following manner:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
>
> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

RESTATEMENT (SECOND) OF TORTS § 652E (1977). Likewise, the Seventh Circuit has explained that to prevail on a false light claim,

> [T]he plaintiff must prove that (1) the defendant placed the plaintiff in a false light before the public; (2) the false light would be highly offensive to a reasonable person; and (3) the defendant acted with knowledge of or reckless disregard for the falsity of the statements in issue—in other words, with actual malice.

*Frobose v. American Sav. & Loan Ass'n of Danville,* 152 F.3d 602, 617 (7th Cir.1998) (citing Illinois law and the Restatement). While we realize that the United States Supreme Court has left open the question whether a state may relax the actual malice standard when the false light plaintiff is a private individual, we have no reason to doubt that Indiana courts would afford a speaker any less protection than provided in the Restatement, especially given its adherence to the actual malice standard in defamation cases involving matters of public interest. *Compare Time, Inc. v. Hill,* 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967) (applying the *New York Times* actual malice standard to a false light claim involving matters of public interest) *with Cantrell v. Forest City Publ'g Co.,* 419 U.S. 245, 95 S.Ct. 465, 42 L.Ed.2d 419 (1974) (finding that private plaintiff in a false light action proved that defendant acted with actual malice, but noting that since the parties did not challenge the actual malice standard, the Court had no occasion to decide whether a state could alter the standard of liability in false light cases involving a private individual); *see Lovgren v. Citizens First Nat'l Bank of Princeton,* 126 Ill.2d 411, 128 Ill.Dec. 542, 534 N.E.2d 987, 991–92 (1989) (adopting the Restatement's actual malice standard in false light cases irrespective of the plaintiff's public or private status, finding that the nature of a false light tort requires that the matter reported by the defendant "was false and deliberately so") (*quoting* W. Prosser & W. Keeton, Torts § 117, at 864–65 (5th ed.1984)); *Moore v. University of Notre Dame,* 968 F.Supp. at 1336 (noting in the context of a defamation action that Indiana law sees no distinction between a plaintiff's public or private status when statements relate to issues of public concern).

 Instead of addressing or even referencing this relevant body of law, St. John alleges hollowly that the "false public statements made by DeFord individually constitute publicity which has unreasonably placed St. John in a false light before

the public." V.Compl. ¶ 53. He claims that "[w]hen looked at as a whole, DeFord's untrue statements put St. John in a false light." Pl.'s Resp.Summ.J. at 14. These skeletal allegations dictate this granting of defendant's summary judgment motion. *See Schroeder v. University of Illinois*, No. 96 C 6020, 1997 WL 587699, at *12 (N.D.Ill. Sept. 18, 1997) ("Failure to produce evidence alone may be grounds for summary judgment.").

As we have discussed previously, we find that DeFord's statement, "And I am not saying anything about Fred St. John," in the absence of any evidence must be taken to mean just that. It simply did not associate St. John with "violations" and "things that went undone," especially since the statement's context reveals DeFord's reluctance even to mention St. John. Yet, even assuming that DeFord did convey this tenuous innuendo, St. John has adduced no evidence that would support a finding that DeFord's statements were false and that he uttered the falsities with actual malice, or negligently for that matter. St. John has not provided sufficient facts for a reasonable jury to find in his favor on the false light invasion of privacy claim, so we *GRANT* defendants' motion for summary judgment on this issue.[22]

### III. Conclusion

For the reasons discussed, we *GRANT* defendants' motion for summary judgment on plaintiff's state law breach of contract, defamation, and invasion of privacy claims. We *DENY* both defendants' motion for summary judgment and plaintiff's cross-motion for summary judgment on plaintiff's § 1983 procedural due process claim because of the inadequacies in the submissions of these issues. We also *GRANT* defendants' motion for summary judgment on the remaining three counts in plaintiff's Verified Complaint (Counts four, five and seven) pursuant to the parties' stipulated request for their dismissal.

---

**22.** We need not address defendants' affirmative defense of discretionary function immunity in light of our dismissal of St. John's state law tort claims.